## Johnson *versus* The Commonwealth.

| 115 | 369 |
| 188 | 165 |
| 115 | 369 |
| 25 SC | 647 |

1. Any circumstance which tends to make the proposition at issue more or less probable is not irrelevant.　It is not necessary to offer at once all the circumstances necessary to prove such proposition.　Whatever is a condition either of the existence or non-existence of a relevant hypothesis may be thus shown.

2. On the trial of one for murder, a witness testified that shortly after the murder his house had been broken into and robbed, that a coat found in the rooms occupied by the prisoner was taken from his house at that time, and another coat left in its place.　This last coat was identified as being similar to the one worn by the person who committed the murder on the night of the murder and also similar to one given to the prisoner a few days before the murder by the warden of the prison where he had until that time been confined.　*Held*, that the admission of this testimony was not error as it tended circumstantially to prove the identity of the prisoner and connect him with the felony charged in the indictment.

3. On the trial of one for murder the District Attorney requested the prisoner to stand up and repeat certain words testified to have been used by the murderer on the night of the murder.　The prisoner promptly acceded to the request without objection either by himself or counsel.　*Held*, that having waived the right of objection and taken the chances of a favorable result, it would be contrary to every rule of practice to permit him to take advantage of what was done even if it were erroneous.

4. Whether it would have been error, had timely objection been made and exception taken to the request of the District Attorney to the prisoner to stand up and repeat certain words, is not decided, as the question was not properly presented to the court.

Per STERRETT, J.　To hold that there was a violation of the clause of section 9 of the Declaration of Rights which declares that the "accused

[Johnson *v.* The Commonwealth.]

cannot be compelled to give evidence against himself" would be a strained construction of that instrument.

5. The right of the Supreme Court to review proceedings of the court below in criminal cases is limited to such rulings on points of law or evidence as are excepted to at the time and made a matter of record.

6. In the general charge to the jury the judge said: "You have heard the evidence of the Commonwealth, it seems to point to this defendant as the murderer; it undoubtedly does." In the next sentence he said, "Whether the evidence is sufficient to satisfy you beyond a reasonable doubt that he is the guilty man is a question entirely for the jury. I do not intend if I can avoid it to give you the slightest intimation of my own judgment. after hearing the testimony, as to what your verdict should be; and if I did you would not be bound by it." *Held*, that the first statement of the judge was not error, as it was merely an expression of opinion that was manifestly warranted by the evidence.

7. On a capital felony by mere mistake of the clerk the record did not show the presence of the prisoner in court either "when the jury was sworn" or "when the verdict was rendered" or "during the time of the trial." Attention having been called to the omission, the court during the same term at which the motion for a new trial was overruled and sentence pronounced, ordered the necessary correction to be made, so that the record would conform to the facts as they actually occurred; and this was accordingly done. *Held*, not to be error.

8. During the term at which the trial of a capital felony was concluded, and while the record is presumed to be in the breast of the court the power to supply clerical omissions and so correct the record that it will conform to the facts, cannot be doubted.

9. The presumption of regularity which prevails in other cases, does not apply to records of conviction in capital felonies.

February 7th, 1887.    Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett, Green and Clark, JJ.

Error to the Court of Oyer and Terminer of *Delaware County*: Of January Term 1887, No. 165.

On March 2d, 1886, Samuel Johnson was indicted for the murder of John Sharpless; on the same day on being arraigned he pleaded not guilty.

The following are the facts of the case as they appeared on the trial before Clayton, P. J.

John Sharpless, a farmer, resided in the township of Lower Providence, in the county of Delaware. On the night of Sunday, November 22d, 1885, about half-past eight o'clock, a rap was heard at the door, which was immediately answered by him. He inquired of the person what was wanted. After some little conversation had passed between them, Jane Pratt, his sister-in-law, went to see what was the matter. She asked John Sharpless what he was going to do, and he told her that the person who had knocked at the door said there was a carriage broken down and he wanted assistance. She asked

him if he knew the man. He said he did not. She then asked him if he was a colored man, and he said, " No, he is a white man." She then went out to the door-way whilst Mr. Sharpless was in the house getting ready to go out, and asked the unknown man if any one was hurt, and he said no. He also said that he was not with them on the road, but had come up and got assistance for them. Her impression was that he was a colored man, although her conversation with the stranger was from the door-way whilst he stood out some little distance, apparently avoiding a close meeting. Jane Pratt's eyesight is not good. John Sharpless having got his umbrella and lantern, then went out toward the barn, being heard to say, " I will go to the barn and get some." Jane Pratt did not want him to go, and said that she had some twine and would give it to him. He replied, " Oh, no, I will go." She says after this she saw the figure of a man following him towards the barn, then she went into the sitting-room and sat down to writing, at which she had been when the rap came to the door. After John Sharpless had been gone some time, and no light had been seen to pass the window towards the road, his wife, Susan Sharpless, who with Jane Pratt and Lydia Reynolds, a cousin, were in the sitting-room, became alarmed, and Jane Pratt said she would go out to the road to see what was the matter. After putting on her rubbers and coat, she did this. When she got there, not seeing any light or vehicle, she returned back and went to the barn, and just in front of the stable door she found an umbrella lying on the ground. She called John Sharpless three times, and not getting any reply she picked up the umbrella and started to Joseph Mickle's, a neighbor. She found Mr. Mickle and his brother at their barn with carriage hitched, the latter being about to go away. They drove over rapidly, at her request, to the Sharpless barn. All went into the stable and John Sharpless was there found lying dead, with his head opposite the entrance to the fifth stall and within a few inches from the heels of a horse in the next stall. He was lying straight out, his hands at rest across his body, and one leg drawn up. On his head were two wounds, sufficient, the doctors said, to produce death.

Whilst Jane Pratt was absent, and Susan Sharpless and Lydia Reynolds were alone in the sitting-room, a noise was heard at the latch of the vestibule door and a strange, tall man entered the room quickly, closing the door behind him. Approaching Susan Sharpless, he greeted her with a half-grunt which she took to be a salutation. She said : " What does thee want?" He replied : "I want a little money." She replied : " We are not in the habit of keeping money in the

[Johnson *v.* The Commonwealth.]

house." He then said: "But I want some." To this she gave no definite answer for a few seconds. He then asked her if they had a young girl living with them. Mrs. Sharpless asked: "A colored girl?" He said, "No, a white girl," and asked to see her. Mrs. Sharpless said: "But thee cannot see her; she is not our girl," she having reference to a young girl in their employ, but who had gone to bed. Lydia Reynolds then said: "We have a colored man and his wife living here," and suggested she would call them. The man replied he did not want to see them, and then, after a few seconds, turned and went out at the door he entered at and closed it after him. Mrs. Sharpless immediately bolted it after him. Mrs. Sharpless described the stranger as a tall man, with long arms, which he held by his side during the whole time, clothing dark, a frock coat, and dark felt hat; a white handkerchief around his neck, not silk; the frock coat of good length and rather neat appearance. She said he had a large nose, "not African;" lips seemed to stand out, as though something was in his mouth, and he talked in that manner and indistinctly. His front teeth were prominent, and to her recollection appeared to be the most distinguishing mark about him, the stranger showing them during the talk with her. In color he was not right black, but not a mulatto, considerably darker.

The night of the 22d of November, 1885, at the time of the crime, was cloudy and drizzly, and the roads muddy. It was not dark, as the moon was almost at the full. The same night, about 10.45, the Lindsays, neighbors of Sharpless, living about a quarter of a mile further west, discovered their barn on fire. It was burned up, with the stock.

Information of the murder was not generally known in the county until the morning of November 23d, and not in Chester City, two and a half miles distant, till near midnight.

A number of persons, white and black, were arrested in the week or two succeeding the crime, nearly all of them on account of some resemblance in their teeth to the unknown man described by Mrs. Sharpless.

On December 12th, 1885, Samuel Johnson, the defendant, was arrested in Philadelphia on information given to the police by a colored man, Pritchett, who had been a fellow-prisoner with him in Moyamensing, who stated Johnson had told him in conversation in a saloon, on Thanksgiving Day (November 26th), that he had knocked an old fellow on the head near Chester, and afterwards that the man's name was Sharpless.

During the trial the Commonwealth, Lewis Morris Lewis on the stand, asked:

*Q.* Where do you live? *A.* Upper Darby. *Q.* State whether or not your house was entered in November last?

(Question objected to by counsel for defendant.)

Proposed to prove by this witness that one of the coats found in the possession of this defendant was the coat of Lewis M. Lewis, and that the other coat that was worn there was left there at the place.

Mr. Cummins: What night?

Mr. Baker: The same week of the murder. Evidence admitted, exception noted and bill sealed for the defendant. (First assignment of error.)

Susan Sharpless called for, the Commonwealth being on the stand, the District Attorney called upon the defendant Johnson as follows:

"Johnson, stand up." The prisoner is asked to open his mouth. Mr. Baker to the prisoner: "Johnson, will you repeat the following sentence: I want a little money. But I want some. Have you a little girl about the house? But I don't want to see them." Johnson is asked to stand up by the District Attorney and put on a slouch hat. This is objected to by the counsel for the defendant. The offer is not pressed by the district attorney. (Second assignment of error.)

The following was the third assignment of error founded on the above.

The court in permitting the District Attorney to place the defendant in the position of compelling him to give evidence against himself, or by objecting to put himself in a more dangerous position before the jury.

Lewis Morris Lewis being recalled, the Commonwealth proposed to ask the witness if he ever saw that spirit level before. Objected to by Mr. Robinson. Proposed to prove that this spirit level, the property of the witness, was taken from his house, and the coat was taken and this coat was left in his place in place of the coat taken from him; and this spirit level was found at a certain place, the same place which was the former lodging of the prisoner. Objected to by Mr. Robinson. The question is admitted. Exception taken by Mr. Robinson, and bill sealed.

*A.* Yes, sir; that is mine. The court: *Q.* When did you miss it? *A.* The Sunday following. I don't know at what time; in the afternoon, I think. It was taken the same time the other things were taken. The court: *Q.* Where did you see it again? *A.* At the Third District Station House. *Q.* Did you then identify these things? *A.* At the station house? *Q.* Yes, sir. *A.* Yes, sir. *Q.* This razor? *A.* Yes, sir. (Razor-strop shown witness.) (Objection by Mr. Robinson.) *Q.* Will you look at this? (Mr. Baker calls the attention of the witness to the fact that the handle of the razor is broken.) *Q.* After looking at that razor do you

identify it? *A.* Yes, sir; that is mine; that is my razor *Q.* When was it missing? *A.* It was taken away upon the same day the other things were taken. *Q.* Where did you find it? *A.* I didn't see it until last Monday evening. *Q.* Did you give any information to the officer when you got the level about the razor-strop? *A.* I told him the razor-strop, and a pair of boots, and some other things had been taken. (A bag shown to the witness.) (Objection by Mr. Robinson.) *A.* That is mine also. Yes, that is mine. *Q.* When did you miss it? *A.* I didn't miss it at the time; it was in my coat I was using in market, but I didn't miss it until at this office. *Q.* Were those your shoes? *A.* Yes, sir. *Q.* Did you identify the bag? *A.* Yes, sir. *Q.* Was there any peculiarity about the coat that was taken? *A.* Yes, sir. (A couple of razors shown to the witness.) *A.* I could not swear about them, they were among the number. The brush I can remember particularly well; it was presented to me twenty years ago, and I kept it. By Mr. George Quinby: *Q.* Where did you next see this? *A.* Not until Sunday night. *Q.* Did you identify it then as yours? *A.* Yes, sir. *Q.* You have a pair of boots on there? *A.* Yes, sir. (Objection by Mr. Robinson.) (Fourth assignment of error.)

The court instructed the jury *inter alia* as follows :

It is your duty to arrive at a just conclusion with reasonable certainty from all the evidence. The jury, therefore, should take up the testimony and consider it in an orderly, calm, systematic manner. A little system is necessary in all cases where an important matter is to be performed. You should, therefore, first direct your attention to the primary question in the case, Was John Sharpless murdered? or was his death the result of accident? That is the first question. I will advise you when you go out to take up that question first. It seems to me that you may find, without doing violence to your conscience, that John Sharpless was murdered. Now, while speaking upon the subject of doubts, there is a possibility, that he was not murdered. There is a possibility perhaps, that he may have fallen in a fit, that he may have struck his head, and that the horse may have trod upon him, or kicked him, while down; but you see it will not do for the jury to indulge in these speculative doubts; the law does not recognize them; you are to decide according to the weight of the evidence. It seems to me, therefore, that you may find that John Sharpless was murdered. You will remember, while considering this question, that he was inveigled from his house; that he was taken from his fireside at night for some purpose, and that he was never seen alive afterwards by any of the members of his family; that he was, when last seen, in the

company of a person, the one who induced him to leave his house, and that he was found in his stable, where he started to go to get a rope, dead, with two wounds on his head, one of which had fractured the skull; that he was found lying upon his back, not with his head from the horses, where it would probably have been if he had been kicked, but with his head toward the horses, his feet the other way and his hands lying at rest upon his body, with one leg a little raised. The evidence, therefore, it seems to me—but the evidence is for you— is sufficient for you to settle the first question, that John Sharpless was murdered. Then comes the second question, By whom was he murdered? Here is where, perhaps, you will have your greatest difficulty. The Commonwealth says, " By the prisoner." The defendant denies it. That is the great issue for the jury. If you find on the first question that he was murdered, you have got over one difficulty; but the great one will be, By whom was the deed committed? [You have heard the evidence of the Commonwealth, and it seems to point to this defendant as the man who committed the crime; but it will be for you to say whether the index is sufficiently certain to warrant you in a conviction. I say, the evidence seems to point to this defendant as the murderer; it undoubtedly does.] (Fifth assignment of error.) Whether the evidence is sufficient to satisfy you beyond a reasonable doubt that he is the guilty man, is a question entirely for the jury. I do not intend, if I can avoid it, to give you the slightest intimation of my own judgment, after hearing the testimony, as to what your verdict should be; and if I did you would not be bound by it. If I were to tell you that I believed the man innocent, you would have no right to take that as having any weight upon you whatever; and if I were to say to you that he was guilty, it ought not to have any effect upon your minds. You are the ones to take the responsibility of settling that question. I have not been sworn to decide that; you have. In considering, therefore, the evidence adduced by the Commonwealth and the answering of that evidence by the defendant, if you shall come to the conclusion that this man is the murderer, then your next great question will be, What is the degree? Is the man guilty of murder in the first or in the second degree? And as I said to you a moment ago, if you find the killing was committed not in an attempt to perpetrate a robbery, and that when the blow was struck only great bodily harm or some other ulterior object was in view, then it is murder in the second degree; but if the blow was struck in an attempt to rob, then, whether the intention was to absolutely kill the man or only to do him great bodily harm, the offence is murder in the first degree.

[Johnson *v.* The Commonwealth.]

Now, was the man killed in an attempt to rob? Here is one of the weak points in the Commonwealth's case; there is no evidence of any robbery; there is no evidence that the dead man's clothing was interfered with; there is no evidence that any money was in his pockets or that any money was taken from him. I confess I was somewhat surprised at this lack of testimony. No one has been called to state whether John Sharpless had any money with him when he left the house or that any money was found upon his person after he was murdered. This fact will have an important bearing upon the question of the degree of the murder, and it is proper you should understand it; for I say to you, you have the power either to find this man guilty of murder in the first or in the second degree; but of course you ought not to exercise this power of finding him guilty in the second degree unless his offence does not rise higher than murder in the second degree. If you find that when that blow was struck he was making an attempt to rob, it does not matter what his intentions were when he went there. He may have intended to rob; but at the time that the blow was struck, was it struck for the purpose of robbing the man? Robbery in law is a personal attack upon a man to deprive him of property then upon his person, by actual violence or putting him in fear. That is robbery in law. I think I have said enough upon this subject for the jury to understand it, therefore we will go on to the next question. If you find, as I stated before, that the man was killed, and that the defendant killed him, and that he killed him while attempting to rob him, then he is guilty of murder in the first degree. If you find that the man was killed, and that the defendant killed him for any other purpose than that of robbing him, and that at the time the blow was struck it was struck without any intention to kill, but only to do him great personal harm, then the offence would be murder in the second degree, and, as I before stated, the question of degree is for the jury. Therefore, I say to you, that under all the evidence, you may either convict this man of murder in the first degree or in the second degree, or you may find him not guilty. Now, to assist you in grappling with the important facts in this case, but without making a close analysis of the testimony, I will call your attention briefly to the testimony of the several witnesses who have been called and examined before you. I will give you a mere synopsis of their testimony. I do this more for the purpose of assisting your memories than for any other object. You are required by law to find the facts from the testimony, and you are not permitted to have the notes of the court or of the phonographer before you, and it is therefore proper that your

[Johnson v. The Commonwealth.]

memories should be assisted as far as possible by the court, as to what the witness said when examined.  Courts are in the habit of grappling with difficulties, and we get into a natural habit of associating ideas to assist memory ; not from any innate power, but from the habit of constantly dealing with these questions, we can remember important points better than jurors, and to a certain extent this is the result as before mentioned of an association of ideas.  If you see the man before and after he has testified, you naturally remember what was said ; but if you can't remember the witness' name or appearance, you will probably not remember anything the witness has said.  Therefore I shall merely give you a list of the witnesses and a brief review of what they said.

No doubt you remember the first witness who was called, Mr. Hall ; now merely naming the witness will probably be enough to recall to you what he testified to.  He was called simply to prove the map and the plan.  That plan you may take out.  The next witness called was the warden or keeper of the jail, Mr. Baker.  He testified that the defendant's personal appearance now is not what it was when he first came to jail.  He says that his beard was more stubby.  He also testified that prisoners have the opportunity once a week to shave.  At a subsequent stage of the proceedings he was called again, and testified as to the mumbling manner in which the defendant spoke, and said it was no uncommon thing for the defendant to show his teeth while speaking, and that they had the appearance of being somewhat prominent.  That is the substance of Mr. Baker's testimony.  The next witness called was Joseph E. Mickle.  No doubt you remember him.  He was the neighbor who was sent for by Jane Pratt.  He tells you what took place when he arrived and what he found.  He is corroborated by the fourth witness, his brother, William Mickle.

The principal witness in the case, and one perhaps without whose testimony this defendant could not be convicted, was Alexander Pritchard, and to his testimony your closest attention ought to be directed.  You should examine it well, because, if you believe Alexander Pritchard, then the defendant may be found guilty of the crime of murder ; it would not be a conviction upon circumstantial evidence at all ; it would be positive, upon the confession of the defendant.  You will remember what the testimony of this man Pritchard was.  He says he was a fellow-prisoner in Moyamensing with the defendant ; that he was at that time in jail for assault and battery ; that he was constantly in contact during the day with the prisoner ; that they were both runners ; that they became rather familiar and talked about what they intended to do

[Johnson *v.* The Commonwealth.]

when they got out.   That the prisoner said he wanted to have a good time after he got out of jail, and Pritchard says he told him that New York was the place to have a good time, but that it cost a good deal of money to have it there.   He says the defendant told him he knew where he could get a stake of $200 or $300, and said that as soon as he got out he was going to get it and that they would go to New York and have a good time together.   Pritchard tells you he was discharged on the 22d of October, and that the prisoner at the bar was not discharged until the 20th of the following November.   He tells you that shortly after his discharge—I think it was on the same day, that will be for you—he met him upon Lombard street.   He tells you how he was dressed, and that he then told him he could get that stake down near Chester and that he was going after it.   He says he saw him the next day, Saturday, which would be the 21st of November, in the evening about 6 o'clock, at Seventh and Lombard, and that the next Thursday he saw him again.   Upon the next Thursday he says the defendant told him that he did not succeed in getting the stake, and he told him that he had to knock an old fellow in the head about two miles from Chester.   Pritchard says he said to him, " Did you ? "   He says he answered, " Yes " but that he only got six dollars.   Pritchard then said, " Are you the man that went to ask for the rope ? "   And he said, " Yes."   " You were the man with the white handkerchief around your neck ? "   And he said, " Yes.   Did you read that in the papers ? "   And he said he did.   Afterwards, when asked about it, he said he heard it from those that had read it.   Pritchard then said, " Do you know you killed that man ? "· and the prisoner replied, " Yes, but don't say anything about it."   He said, " Then don't say anything more to me about it."   Pritchard said the prisoner told him he only got six dollars, and then had two dollars in his pocket.   The third Saturday after this he says he met him again and asked the name of the man that he knocked in the head, and he told him it was Sharpless.   That on the 28th of November, Pritchard says he informed the police.

Now that is the substance of Pritchard's testimony.   Of course I have not given all the details, but that is the substance of it.   Now, you saw the witness, you heard the cross-examination, and you have heard the other corroborating testimony, and it will be for you to say whether you believe him.   If it is true, then the evidence is sufficient to convict this man; but if you do not believe it, you may acquit him. No witness has been called who has said upon his oath that Pritchard is a man unworthy of belief.   In law every man who testifies under the sanction of an oath, is *prima facie* entitled

to credence. There are several ways, permitted by the law, to discredit a witness. The most familiar way is to call those acquainted with him, and let them say whether they know the man, and whether they know others who know him, and what his reputation is for truth and veracity. The mere fact that he has been convicted of assault and battery, is not sufficient to throw discredit upon him as a witness. If a witness is convicted of a felony, it sometimes is sufficient, but the mere fact that he is now under arrest for robbery, is not in itself sufficient to discredit him, for the law presumes him to be innocent until he is proven guilty. You may, however, consider all the facts—the fact that he was in jail, the fact that he is now under arrest—as that may influence you with the other testimony in the case in rejecting his story. So you may believe or disbelieve him; but as a rule a witness is entitled to belief unless some good reason be given for discrediting him. Now, of course, you will give the defendant credit for his inability to procure witnesses; you will remember that he has been in jail, and that he is poor and friendless to a certain extent, and that while no witness has been called to discredit the credibility of Pritchard, it may be that if the prisoner had the means, he could, perhaps, have procured some witnesses upon that subject. I only call your attention to the fact that it has not been done, and at the same time that the defendant was in actual custody, and, of course, could not procure witnesses with the same ease that the Commonwealth could. If you believe the testimony of Pritchard, it would seem that the defendant is guilty of the murder of John Sharpless. If you do not believe the testimony of Pritchard, then there is sufficient, it seems to me, to warrant you in saying he is not. And you will, of course, endeavor to ascertain whether Pritchard has been corroborated, whether he has been contradicted in any material misstatement, whether he has prevaricated. You will call to your mind his manner of testifying, and upon this most vital testimony you ought to carefully deliberate. He certainly has been corroborated as to all that he has testified to as having taken place while they were both in Moyamensing, except as to the conversations. He was what he testified to, a runner, and the defendant was a runner; they were frequently together; they occupied the same cell during their leisure hours; that has been proved by Mr.— (Mr. Baker: "Mr. Livingstone,") Mr. Livingstone. To a certain extent he is corroborated as to what took place after he got out of prison also. He tells you where he went and where the defendant went, that they visited the girls and went to different places together, and this does not seem to be contradicted by the defendant's witnesses, and is to a certain extent corroborated.

[Johnson *v.* The Commonwealth.]

The next witness called was George Yorke. He tells you that the defendant came to his place on Friday evening at seven o'clock, and he describes his dress, and that the defendant told him he was going into the country to hunt work, and that he slept upon his floor that night and left next morning at eight o'clock; that was Saturday morning. He says he saw him the next Wednesday, and that he said he had been husking corn, and said that he had heard a touch of the murder, and that people were mean enough now to do anything. That is the substance of Yorke's testimony. [The defendant has been able to account satisfactorily for where he was from the time he got out of jail up to ten o'clock on Saturday morning— (Mr. Baker: "Sunday morning.") And up to two o'clock the next morning. Between those two periods there is a bad break, and it was between these two periods of time that John Sharpless was killed. He has not been able to tell us where he was that night. That is the unfortunate part of his case.] (Sixth assignment of error.) The next witness is Annie Yorke. She was the wife of George Yorke, and simply corroborated him as far as she could. The Commonwealth then called the reputed wife of the defendant, and the judge felt it to be his duty under the law and under the evidence to exclude that witness. Now I want to warn you against giving any weight to any intimations made as to what that witness would have testified to. You must banish it from your minds. She was the wife of the defendant and she could not testify against him; the law prohibits it; and you must not allow your minds to be in the slightest degree affected by the reference which has been made to the affidavit by Mr. Norris. He tells you that he procured the affidavit, read it to the defendant and asked him to explain it. You must not allow yourselves to give any weight whatever to what the woman swore to in her affidavit, or what she would have testified to. Nor are you to supply in your minds what you suppose the woman would have sworn to; her testimony is ruled out, and it is to have no weight whatever in settling this issue. [The next witness called was Charles Stephens. His testimony was important. You will remember the witness. He tells you that between one and two o'clock on Monday morning, the murder having been committed between nine and ten o'clock on Sunday night, some five or six hours after the commission of this terrible crime, that this defendant came to his house, cold, shivering and muddy, and desired shelter.] (Seventh assignment of error.) He says he let him in and gave him a quilt, and that he set him in a chair by the fire. He says that the man shivered and shook and groaned all night. He also says that the defendant told his wife in his hearing that he had been sleeping

in barns and out-buildings, and that he had caught a terrible cold, and that he had seen Sharpless's barn burned. He called it Sharpless's barn; he said that it lighted up the whole country round. Now that is very important testimony, and when compared with Pritchard's, it has an undoubted bearing upon the case. If it is true, it would indicate that this defendant was in the vicinity of this murdered man's house at that time, for, at quarter to eleven, Mr. Lindsay tells you he was awakened because of his burning barn; and if the witness, Stephens, tells the truth, the defendant saw the light of the flames of that burning barn. Now remember, gentlemen, I do not pretend to give every word these witnesses say. I am only recalling to your minds the important parts of their testimony, and if I leave anything unsaid, and you remember anything that the witnesses have said having a bearing upon the case, give it due weight.

The next witness called was Daniel Livingstone, the keeper of the jail, who tells you that Pritchard and the prisoner were friends, that they were in the same cell together in the daytime, and he tells you the kind of clothes the prisoner had on when he left the jail on Friday, and that is about all he knows of the case. He tells you that he was dressed in a dark suit, frock coat, and he recognized the coat so far as to say that it looks like the coat he gave him. The next most important witness in the case, important for the defendant as well as for the plaintiff, is Susan Sharpless, the widow of the murdered man, and to my mind her testimony is inclined to cast more doubt upon the Commonwealth's case than that of any other witness. She was present when the alleged murderer entered the house; she was in a state of excitement and fear lest something had happened to her husband, and one would think that she would never forget the face of the man she supposed was his murderer, as she saw it that night. She tells you she was near enough to put her hands on him. After closely examining this man she is in doubt. She says she cannot say that this is the man that was in her house that night. She tells you his voice is similar, but that he has not got the nose and teeth. The nose she says is something like his, but the teeth she says are not the same as she saw them that night, and she says she will never forget those teeth. You will take her testimony with the other testimony in the case, and if its effect is to cause you to fairly doubt whether this is the man who murdered John Sharpless, he is entitled to the benefit of it. She gives you a description of the knock at her husband's door at half-past eight in the evening; she tells you how the man stood with his arms close to his side, of his stealthy entrance, of his mumbling voice, and, what she particularly noticed, was his

teeth. The District Attorney alleges that this man has promi-
nent teeth, but it seems to me that the evidence upon that
subject does not comport with Mrs. Sharpless's description of
the appearance of the man. Unless, therefore, there was some
attempt to disguise, her testimony, as I before stated, is the
most important, to my mind, for the defendant. Jane Pratt
was called next. She said that John Sharpless told her that
the man who called him out was a white man, but she says,
when she went out to talk to the man, she found he was a black
man. You will remember that the man was not in the full
rays of the light from the house. As I understand it he was
on the porch, or the vestibule, and when she spoke to him she
had the impression that he was a white man from what John
Sharpless had told her, but his appearance was sufficient to
overcome that impression, and she found he was a black man,
and her testimony as to his color has great weight, especially
when Mrs. Sharpless tells you that the man who entered the
house was a black man, and she says he was about the color of
this man. Now you will give to that expression of John
Sharpless whatever weight it is entitled to. He said, undoubt-
edly, that the man who called him out was a white man, and
you have the evidence of his wife and that of Jane Pratt that
he was a black man. Mrs. Sharpless also fixes the time when
Jane Pratt left the house to hunt for her husband; it was
9.04. It appears that one of the windows was open, and Jane
tells you that after she had been down to the road, which took
her perhaps four or five minutes, she looked in at the window
and saw Mrs. Sharpless walking around the table, so you may
find that that was the time that the man was confronting Mrs.
Sharpless, about 9.04; that was about the time the man left
the house.

The theory of the District Attorney is, that when the mur-
derer came from the barn he looked in at the window and saw
that one of the women was missing; he supposes that the
defendant also looked in at the window before, and that he
had taken Jane Pratt to be a girl; she was small and had
something of the appearance of a girl; and when he came into
the house and found that the one he had previously seen
through the window was not there, he thought she had gone
to give the alarm, and that is the reason he asked, "Where is
the girl?" That is the theory of the District Attorney, that
when the man demanded, "Where is the girl?" he meant
Jane Pratt, and when he found she was not there, he supposed
she had left for the purpose of giving the alarm, and that is
the reason that no further felony was perpetrated. Take that
for what it is worth. But it is somewhat singular that a man
should be murdered, and his person not robbed and no attempt

made to rob the house, if that was the intention of the murderer. Now give this theory of the District Attorney whatever weight it is entitled to, as applied to the evidence. If it is reasonably consistent with the evidence, adopt it; if not, reject it. Lydia Reynolds says her eyesight is not good; her testimony corroborates Jane Pratt and Mrs. Sharpless. She says she thinks there is a similarity between the voice of the defendant and the voice of the man as she heard it that night.

John Lindsay's testimony is important. It is important for the defendant as well as for the Commonwealth. He tells you that his barn was burned that night; that he went to bed at ten o'clock, and that at a quarter of eleven he was awakened by his barn burning, and that he supposes the barn had been burning for some time. He also tells you that he knew the defendant, and that he believes that John Sharpless knew him, as he had sent this defendant over there upon errands. Now you can take that testimony, and if it has caused you to doubt whether this man was the man that murdered John Sharpless he is entitled to the benefit of it. Unless he disguised himself, the presumption is that John Sharpless would know him. This may have been his reason for calling the man out, so that he might rob him there, out in the dark, and enter the house afterward. But the presumption is, that he would not go to the house of a man that he knew without being disguised, and there is no evidence that he was disguised. The fact that he had a white handkerchief around his neck is not evidence that he was disguised. Neither Susan Sharpless nor Jane Pratt say that he was disguised. If he knew John Sharpless, and Mr. Lindsay says that he thinks that he did, you should give that due weight in considering the case. Walter Lindsay's testimony merely corroborates his father.

[Then comes the testimony of another very important witness—to my mind, one of the most important witnesses in the case—Mr. Lewis Morris Lewis. He lives in Upper Darby. One week after this murder, his house was entered by somebody, and among other things taken he missed a coat, and found a coat which was left there. The coat he missed was found in the apartment of the defendant, and the coat he found is identified as looking like the coat that Mr. Livingstone gave to the defendant when discharged from jail a week or so before; and it is also identified as looking like the coat that Mrs. Sharpless says the man had upon his back the night of the murder. I look upon this testimony of Lewis M. Lewis as very important. Undoubtedly, if the coat that is produced is the coat that was worn by the man who stood in the presence of Mrs. Sharpless, then that coat would seem to be sufficiently traced to the defendant. The defendant, when asked

to explain this difficulty, said that he had bought the coat that had been taken from Mr. Lewis, from a tramp; and when he was asked how he came to be possessed of the spirit level, he said he had found it upon the street. He was not asked how he came to be possessed of the other articles, but that excuse is too flimsy to be believed; it is not sufficient, to my mind, to raise a reasonable doubt.] (Ninth assignment of error.)

It seems to me there is evidence from which you may find that this defendant left the coat which is produced here, and identified by Mr. Livingstone and by Mrs. Sharpless, at Mr. Lewis', and took Mr. Lewis' coat with him, and at the same time took the other articles found in his room. I say to you, that in my opinion Mr. Lewis' testimony has a bearing upon the general question, as well as upon this particular part. It is very important, and it ought to be given due weight.

The next witness was Dr. Frank Rowland. He made the *post-mortem* examination, and has described to you the character of the wounds upon the murdered man. He tells you that either might have produced death, but that the one upon the side of the head was the immediate cause of the death of John Sharpless, and was produced by some heavy, blunt instrument like a hatchet. In his judgment, the one upon the top of the head, on the occipital bone, was made by a sharp instrument, looking as if the one was made by the sharp part of the hatchet, and the second by the pole; but no hatchet has been found, and there is no positive evidence how or with what instrument the blow was inflicted; it might have been done with the heel of a boot.

[Next comes the testimony of William Hahn. If the jury believe this witness, and I can see no reason why they should not, they will come to the conclusion that the negro man who called at his stand early on Monday morning, before it was known in Philadelphia that this murder had been committed, because the details were not telegraphed to Philadelphia until 10.30, was the murderer of John Sharpless. For at 8 or 8.30 in the morning, two hours before the associated press received the news from Chester, a colored man came to his stand and asked for a paper giving an account of the murder near Chester. I say to you that the jury may come to the conclusion, without much hesitation, that the man who asked for that paper, whoever he was, was the murderer of John Sharpless.] (Eighth assignment of error.)

He was, in all probability, the man who committed the deed. That would seem to indicate that it was a colored man and not a white man. As to the identity of this man, it is not by any means satisfactory. He says that in general appearance the prisoner looks like him; he tells you how he was dressed;

but he says he thinks the man had broader shoulders; he says he was the same color. He looked at the coat and said that it was similar. You can take the testimony of that witness and fit it with the other testimony, and then form your conclusion from the whole. The next witness called tells you that he is the agent of the associated press in Chester. By this association all the newspapers, he says, have an arrangement among themselves by which any item of news is distributed among all the papers belonging to the association, and most of the papers belong to it. He says that he is the agent in Chester and that it was 10.30 Monday morning when he sent the dispatch. Morris Landauer, a reporter, says it did not appear in the Philadelphia morning papers, and that it was not known to the press. Chief of Police Williamson, however, says that he telegraphed to Philadelphia at 2.13 in the morning that a murder had been committed, but it appears that it did not get into the papers. Then comes Thomas Alexander. His testimony is only important as bearing upon the manner in which the man was dressed. He corroborates the other witnesses as to his dress and the finding of the spirit level, and as to what was said by the defendant about the coat. It is very important as bearing upon that point. Chief Williamson's testimony was directed to the time he sent the dispatch. My recollection is, that it was 2.20 in the morning.

The testimony of James McKniff is not important. The testimony of Carrie Lane has a considerable bearing upon the case. She tells you that she has rooms to let, and that the wife, or the alleged wife, of the defendant, secured a room there for herself and her husband, and that the coat found there and the other articles were the property of the defendant, and in that respect her testimony is important. Then comes the testimony of John Norris, one of the editors of the Philadelphia *Record*, who is evidently a gentleman of more than ordinary intelligence and of apparent candor. He seems to have exercised more than ordinary energy in endeavoring to ferret out this murder. He is to be commended for that, not condemned. He tells you that the press gave, after the details of the murder had been worked up as far as they could, $125 to Detective Alexander to defray the actual expenses incurred. There was nothing wrong in that. That money was paid; it was not demanded. It was given to cover incidental expenses incurred in working up the case. He also tells you that he had several conversations with this defendant, which he recounted here yesterday. He tells you that some of the efforts of the defendant to explain away inconsistencies were failures. He tells you that after a long conversation, calling the defendant's attention to inaccuracies and inconsistencies,

5 AMERMAN—25

to what his wife had said (to this you will, of course, pay no
attention except so far as the answers are concerned), he said
it was only a pack of lies, and that he supposed he would be
tried and reckoned he would be hung for it.   That is what he
said.   You can say what bearing that might have upon the
case.   Witness also states that he walked over the ground
from the place where the defendant arrived at Stephens' house
to the Sharpless barn, and he says he walked it in three hours
and forty minutes.   In this he is corroborated by Lieutenant
Roche and Mr. Curley, and this is all the testimony of the
Commonwealth.   I have called your attention to the wit-
nesses now and given you a synopsis of their testimony.   If I
have left untouched any material point, the jury can remember
it and, of course, supply it.   My object in calling your atten-
tion to these witnesses is to strengthen your memory, because
upon the testimony you are to decide the case.   I have no
doubt you will now remember sufficiently all the important
points in the case.

   Now as to the defence.   The defendant alleges that there is
a mistaken identity here, and that the witnesses that have been
produced against him, Pritchard and Stephens, are actuated
by a malicious desire to get him out of the way.   He says
that Pritchard is anxious to get him out of the way in order to
get the reward, and that is the object he has.   He says his
wife is anxious to get rid of him that she may live with another
man, and that she may not be liable for prosecution for adultery
while she is with him, and that Stephens wishes it so that he
may live with his wife.   That is the defence.   He also relies
upon the failure of Mrs. Sharpless to identify him, and lays
great stress upon the fact that John Sharpless said that it was
a white man, and it is apparent that the defendant is not a
white man.   The testimony of Elijah Yorke, Mrs. Simmons,
Lydia Fitzgerald, and Benjamin White are not important
except to corroborate some of his statements, and to explain
some inconsistencies in what he had said to Mr. Norris.   But
upon the whole, their testimony corroborates one side about
as much as the other.   I have no doubt but the girls all tell
the truth.   There is nothing inconsistent with their testimony
and that of the Commonwealth.   You can easily harmonize
all the testimony produced upon the part of the defendant
with that on the part of the Commonwealth without per-
jury in any witness.   We have also John C. Lindsay; as I
before stated, he informed you that in his judgment John
Sharpless knew this man, and that is an important part of the
case.   Now I am about to leave the case with you, and I have
no doubt that after you have carefully considered all the
evidence, you will be able to come to a satisfactory conclusion.

As I before stated, you must not try to please the people ; you must not find the defendant guilty because you think it will be acceptable and agreeable to a great majority of the people of Delaware county to see some victim suffer for this crime. If the defendant is found guilty, it must be because from all the evidence you consider him guilty ; and it seems to me under all the evidence, that you may find him guilty or you may find him not guilty ; you may find him guilty of murder in the first degree, or you may find him guilty of murder in the second degree.  With these remarks I leave the case with you entirely.  We have done our part and you must now do yours.  Do it conscientiously, and the court will be satisfied with your verdict.

A rule for a new trial was granted and after argument discharged.  Verdict of guilty of murder in the first degree, whereupon the defendant was sentenced to be hanged.  He thereupon took this writ and in addition to the assignments of error above shown he filed the following assignments of error.

The record does not show that the prisoner was present when the jury were sworn.  (Tenth assignment of error.)

The record does not show that the prisoner was present when the verdict was rendered.  (Eleventh assignment of error.)

The record does not show that the prisoner was present during the time of trial.  (Twelfth assignment of error.)

The record as first made up did not show that the prisoner was present when the jury was sworn, when the verdict was rendered or during the time of the trial.  As a matter of fact however, the prisoner was present at the swearing of the jury, the rendering of the verdict and through all the time of the trial.  The attention of the court was called to this omission during the same term at which the motion for a new trial was overruled and sentence pronounced.  The court thereupon ordered the necessary correction to be made so that the record would conform to the facts as they actually were.  The record was accordingly thus corrected.

*John B. Robinson* and *James Cummings*, for plaintiff in error.—I. The first and fourth specifications of error will be considered together, as they both relate to the admission of Lewis Morris Lewis' testimony.

By this witness the Commonwealth proposed to prove that a spirit level and a coat were taken from his house, and another coat was left there by the person who took Mr. Lewis' coat.

It was error to admit this testimony.

" To make one criminal act evidence of another, a connec-

tion ·between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish, or it must be necessary to identify the person of the actor by a connection which shows that he who committed the one must have done the other: " Shaffner *v.* Commonwealth, 22 P. F. S., 60; Goerson *v.* Commonwealth, 3 Outerbridge, 398; Shaffner *v.* Commonwealth, 22 P. F. S., 65; Zell *v.* Commonwealth, 13 Norris, 258.

II. The second and third assignments of error may be considered together.

When the Commonwealth directed the prisoner to "stand up," and to otherwise make profert of his person, unseen it held over him, then presumed wholly innocent, the sword of Damocles. It is not the law of the land that truth should be thus extracted or the guilty convicted.

This point is one never reviewed before, we believe, in the Supreme Court of this state, but is covered in the following authorities: State *v.* Jacobs, 5 Jones (North Carolina), 259.

In Day *v.* State, 63 Georgia, 669, the court say : " Better that the vindication of outraged justice be postponed for a season than that a human being, however deeply stained with crime, be convicted and punished contrary to law."

See also People *v.* Mead, 50 Mich., 228: "It is highly improper," commenting upon this Michigan case, says the Amer. Crim. Law Magazine, p. 810, " to ask one accused to do any act that would aid in any way to make evidence against him."

Nothing is better settled than that a defendant in a criminal charge cannot be compelled to produce a private paper which would be evidence against him on his trial.

There is no difference in the principle between this protection and the shield of the Constitution, which protects his person from being indecorously inspected : People *v.* McCoy, 45 How. (N. Y.), 216.

The true intent of the constitutional guarantee, which we invoke, is that an accused in a criminal trial should not only have the right to close his mouth, but he could fold his arms and refuse to be a witness against himself in any·sense, or to any extent, by furnishing or giving evidence against himself, whether by testimony under oath or affirmation, or confessions or admissions without either, or by proof of a physical nature.

For a full review of this subject, new in this state, see Amer. C. L. Jour., Vol. 6, 805.

No consent of the prisoner in the extremity of his need ought to bind him : " Prine *v.* Com'th, 6 Harris, 103 ; Pieffer *v.* Com., 3 Harris, 470 ; Rex *v.* Woolf, et al., 1 Chitty's Rep., 401.

In the case of Stokes *v.* The State, 30 Amer. Rep., page 72,

[Johnson v. The Commonwealth.]

the court held that an accused person in the presence of the jury should not be asked to make evidence against himself. This is a case where a criminal defendant was called on to make tracks in court in a pan of soft mud brought in for the purpose and in the presence of the jury.

The Act of 1885 is ably construed in Commonwealth v. Brown, 16 W. N. C., 557.

III. The court must not decide on the weight of the evidence : Elkins v. McKean, 79 Pa. St., 493.

IV. The burden of proof never shifts but rests on the Commonwealth throughout : Turner v. Commonwealth, 5 Norris, 54 ; Pannell v. Commonwealth, 5 Norris, 266 ; Commonwealth v. Brown, 16 W. N. C. 557.

V. A misstatement by the judge in his charge of any of the evidence is error: Goersen v. Com'th, 3 Out., 388.

Where the language of the charge as to the true character of testimony tends to mislead the jury, it is error : Fawcett v. Fawcett, et al., 14 Norris, 376 ; Elkins v. McKean, 79 Pa. St., 493.

VI. The tenth, eleventh and twelfth specifications of error relate exclusively to the correctness of the record, as it does not show that the prisoner was present when the jury were sworn, or at the rendering of the verdict, or during the time of trial.

In capital felonies, it must appear by the record that the prisoner was present at the trial, verdict and passing of sentence ; his presence cannot be presumed : Dougherty v. Com'th, 19 P. F. S., 286 ; Hamilton v. Com'th, 4 Harris, 129.

In Prine v. The Commonwealth, 6 Harris, 104, Gibson, C. J., said: "Never has there heretofore been a prisoner tried for felony in his absence. No precedent can be found in which his presence is not a postulate of every part of the record."

The Act of 1718 is the groundwork of our criminal law, and is still in force: Dunn v. Com'th, 6 Barr, 384.

The record must show that the prisoner was present at the trial, particularly at the rendition of the verdict. Every record of this kind ought to show clearly that the prisoner was tried and sentenced, and is to suffer according to the substantial forms of law : Id., 389.

*Jesse M. Baker*, District Attorney for the Commonwealth, defendant in error.—I. The effort of the Commonwealth was not for the purpose of "making one criminal act evidence of another" as in Shaffner v. Commonwealth, 22 P. F. S., page 60, and Goerson v. Commonwealth, 3 Outerbridge, page 398. Nor was ("The evidence so dubious that the judge did not clearly perceive the connection") as is referred to in Schaff-

ner *v.* Commonwealth, 22 P. F. S., 65. Nor was there any attempt during the trial to show that the defendant was guilty of any other crime than that for which he was charged. As stated before, it was simply a link in the chain of circumstantial evidence.

Evidence, however slight, which tends to corroborate the testimony as to the *res gestæ* will not be considered incompetent: Moyer *v.* The Commonwealth, 39 Leg. Int., 160; McConkey *v.* Commonwealth, 40 Leg. Int., 102.

" This court must look at the real competency of the evidence and not at the order of its reception when it is found that the evidence is all finally competent, will not reverse because of the time or order of its introduction: " Carroll et al. *v.* The Commonwealth, 3 Norris 152.

II. The court below says: "As the case stands the prisoner voluntarily exhibited himself to the witness for identification. After carefully examining him the witness failed to identify him. His counsel then considered it a strong point in his favor. The jury were so instructed by the court. As he did not see proper to object then it is too late to object now. The authorities are abundant and clear upon the subject: Fife *v.* Com'th, 5 Casey, 429; People *v.* Thompson, 41 N. Y., 6; People *v.* Casey, 72 Id., 399; Connors *v.* People, 50 Id., 240; Brotherton *v.* People, 75 Id., 159; People *v.* Guidice, 2 Eastern R., 923. "It is enough if the court respond to all objections to testimony taken by either party and give the proper instructions to the jury. A verdict will not be set aside because improper evidence was admitted, if no objection to its admission was made at the trial: 1 Wharton's C. L. Motions for New Trial; Wait *v.* Maxwell, 5 Pick., 217; Dau *v.* Gerger 4 Halst., 225; Worford *v.* Isbell, 1 Bibb., 247; Cannon *v.* Alsbury, 1 A. K. Marshall, 76; Rice *v.* Bancroft, 11 Pick., 469."

The Supreme Court has no authority to look beyond the record and as to the matter complained of in the second and third assignments of error it is not based on any exceptions taken in the court below: Jewel *v.* Commonwealth, 10 Harris, 99; Cathcart *v.* Commonwealth, 1 Wright 110.

The right of review is limited by law " to points of evidence or law *excepted* to by the defendants and *noted* and *filed* of record by the court: " Fife et al. *v.* Com'th., 5 Casey, 429; Hopkins *v.* Com'th., 14 Wright, 9.

" After the admission of evidence without objection, there can be no bill of exceptions to its admission *nunc pro tunc:* " Robinson *v.* Snyder, 1 Casey, 207.

" That whether the evidence received on part of the plaintiff be legal or not it was heard without objection and the court

[Johnson v. The Commonwealth.]

was not asked to say anything about it in the charge:" Robinson v. Snyder, 1 Casey, 207.

"The defendant permitted the case to close and argued upon the effect of what the witness had stated both to the court and to the jury. Having used it for his own purpose, and having taken the chance of influencing the jury by it favorably to himself he thereby waived his objection and passed his time:" Rees v. Livingston, 5 Wright, 119; McInroy et al. v. Dyer, 11 Wright, 120,

"The defendant cannot permit answers which he may now choose to call irregular to go to the jury without objection and to suit his own purpose at the time of trial, and then claim a new trial on the ground of its admission:" Commonwealth v. Sullivan, 13 Phila., 418.

III. "A judge may rightfully express his opinion respecting the evidence, and it may sometimes be his duty to do it, yet not so as to withdraw it from the consideration and decision of the jury:" Johnson v. Commonwealth, 4 Norris, 65; Kilpatrick v. Commonwealth, 7 Casey, 216.

"If the case were in the least doubtful upon this part of the evidence, or if there had been anything for the jury to hesitate about, there might have been more force in this assignment of error. As it stands, the defendant could not have been injured by that portion of the charge complained of. The charge of the court must be considered as a whole:" Kilpatrick v. Commonwealth, 7 Casey, 216.

Mr. Justice STERRETT delivered the opinion of the court, March 21st, 1887.

In view of the evidence before the jury, it may be safely assumed they had no difficulty in reaching the conclusion that the killing of John Sharpless was a wilful, deliberate and premeditated murder, and also that the perpetrator of the crime was the person who enticed him from the house and shortly afterwards returned thither and demanded money from Mrs. Sharpless. All the facts and circumstances testified to by those who were present at the time, together with those disclosed by the *post mortem* examination, point with reasonable certainty to these conclusions. The verdict, based upon such evidence, may therefore be regarded as conclusively establishing the *corpus delicti*. But, of course, it was incumbent on the Commonwealth to go farther and prove to the satisfaction of the jury that the prisoner was the guilty man. Testimony was accordingly introduced for the purpose of identifying the prisoner, locating him near the scene of the murder about the time it was committed, and proving his own admissions of guilt.                                                       . . .

[Johnson *v.* The Commonwealth.]

On the subject of identity, the testimony tended to prove that, in general appearance, prominence of front teeth, tone of voice, character of dress, etc., the prisoner resembled the assassin as seen by members of deceased's family on the night of the murder. They represent him as being clad in dark clothing, soft felt hat, long frock coat, white handkerchief around his neck, no overcoat, etc. The hat and coat, as described by them, correspond with those that the keeper of Moyamensing Prison says he gave Johnson upon his discharge therefrom on the preceding Friday morning, and those worn by him during the next two succeeding days.

According to the testimony of Charles Stephens, the prisoner came to his house between one and two o'clock in the morning—three or four hours after the murder—clad in a dark suit of clothes, slouch hat, long coat and handkerchief around his neck. After remaining a few hours and warming himself he left before daylight same morning; but before leaving he said to Stephens " he had been husking corn down the country and had stopped at places where he generally lodged and could not get in, and had been recommended to come over to my (his) house to warm himself ; " also said " he had seen Sharpless' barn on fire and it lighted up all the woods around ; . . : . . had seen it burning that night when he came past it to come up here." Speaking of the prisoner's condition at that time, the witness says " he was foot sore and sick, and it appeared to me the man had chills : he was shivering and groaning as a sick man would."

The evidence of self-criminating admissions is found in the testimony of Alexander Pritchett, who says in substance that he and Johnson, as fellow-prisoners in Moyamensing, talked familiarly about what they would do when their respective terms of imprisonment expired. A trip to New York and the expense attending same being suggested, Johnson said he knew where he could get two or three hundred dollars, and when they both got out he would " go down and get that stake and then " they would go over to New York. Pritchett was discharged from Moyamensing in October, 1885, and Johnson on Friday, November 20th following. They met that morning, and in course of conversation Johnson said, " I think I can get $200 or $300, about two miles from Chester. . . . . . I am going down to get it." After remaining together about two hours at that time they separated and met again next evening. Johnson then said, "I am going down to get that stake, . . . . . . I don't want to go down before Sunday night and I am going to walk." Pritchett also testified that at their next interview on following Thursday, Johnson said, " I didn't get what I went for and I had to knock an old fellow in the head

[Johnson v. The Commonwealth.]

down here about two miles from Chester, . . . . . and I got only $6." At a subsequent interview—three weeks afterwards —Johnson said the name of the man he had knocked in the head was Sharpless.

All the evidence, direct and circumstantial, bearing on the subjects thus briefly adverted to, was competent and proper for the consideration of the jury. It was fairly submitted to them in a clear and comprehensive charge of which the prisoner has no reason to complain. The credibility of the witnesses was solely for the jury. If they believed that Pritchett testified truthfully as to the prisoner's self-criminating admissions, and that those admissions were not a tissue of wilful falsehoods uttered by the latter, they were warranted— especially in view of other corroborating evidence—in rendering the verdict they did. The case of the Commonwealth did not rest upon the testimony of Pritchett alone. The evidence as to the prisoner's identity, his whereabouts at the time of the murder, etc., tended in no small degree to corroborate the truth of the admissions testified to by Pritchett. One of the most damaging circumstances in the case was the fact referred to by the learned judge in his charge, viz: that while the prisoner's whereabouts was satisfactorily accounted for from the time he left Moyamensing on Friday morning until about ten o'clock Sunday morning, and then from between one and two o'clock that night until he was arrested, the gap between Sunday forenoon and midnight was not accounted for except by his own admission to Stephens, and that tended to locate him at or near the scene of the murder about the time it was committed. One of his own witnesses, Benjamin White, testified he saw him at ten o'clock Sunday morning, and that night, shortly after midnight, he went to Stephens' house for shelter and told the story of his having been down the country husking corn and having seen the burning barn on his way up. The theory of the Commonwealth was that the prisoner set out on a mission of robbery Sunday forenoon, went to the house of Mr. Sharpless that night, enticed him therefrom and murdered him, and went thence to the house of Charles Stephens where he arrived between one and two o'clock in the morning. The evidence in support of this theory was both direct and circumstantial. If the jury believed, as they doubtless did, that all the facts and circumstances, as they found them, pointed clearly and satisfactorily to that conclusion, and were at the same time irreconcilable with any other reasonable hypothesis arising out of the evidence, they could not consistently do otherwise than find him guilty; and their verdict should not be disturbed unless the learned judge

erred in one or more of the particulars specified in the assignments of errors.

The first and fourth specifications, relating to the testimony of Lewis Morris Lewis, may be considered together. The evidence therein complained of was not introduced for the purpose of showing the prisoner was guilty of a distinct and independent crime, but as a link in the chain of evidence tending to prove this identity. It is never irrelevant to give in evidence any circumstance which tends to make the proposition at issue more or less probable. Nor is it necessary to offer at once all the circumstances necessary to prove such proposition. The party seeking to prove or disprove it may proceed step by step, offering link by link. Whatever is a condition, either of the existence or non-existence of a relevant hypothesis, may thus be shown. No matter how slight may be the inference of identity to be drawn from any single fact, it is admissible as a fragment of the material from which the induction is to be made : Whart. Evidence, Sects. 21, 24, and authorities there cited. Mrs. Sharpless had testified, *inter alia*, that the man she confronted, on the night of the murder, wore a dark frock coat, " of pretty good length," &c., corresponding to the one exhibited in the court. The testimony of the keeper of Moyamensing prison was, that when Johnson was discharged on November 20th, he gave him "'a pair of black pants, a long dark coat," similar to the coat shown in court and referred to by Mrs. Sharpless. It was important therefore for the Commonwealth to show where the coat thus exhibited to these witnesses came from, and if possible connect the prisoner with its possession. For that purpose the testimony of Lewis, in connection with that of Officer Anderson was relevant. The latter testified that in the house where prisoner lived when arrested he found two coats, claimed by him, one of which he said he had bought from a tramp in West Philadelphia; also a spirit level which he said he had found on the street. The coat which he alleged he had bought from the tramp, spirit level and other articles found in his possession, were identified by Lewis as his property taken by some one from his house shortly after the murder. He also identified the coat—exhibited in court and referred to by Mrs. Sharpless and Livingston, the keeper of Moyamensing — as the coat left at his house at the time his own coat, spirit level and other articles were taken. The tendency of this evidence was to trace into the prisoner's possession the coat thus identified by Lewis. In the absence of satisfactory explanation as to how he acquired Lewis' property the fact that these articles were found in his possession and were claimed by him, warranted the inference that he probably

took them away and at the same time left the long frock coat in question. The evidence, it is true, was purely circumstantial, and in itself perhaps not very strong, but it was nevertheless relevant and proper for the consideration of the jury in connection with other facts and circumstances tending to prove the identity of the prisoner and connect him with the commission of the felony charged in the indictment.

The second and third specifications, relating to the action of the district attorney in calling upon the prisoner to stand up and repeat certain words, &c. in the presence of Mrs. Sharpless, may be dismissed with the remark that no objection was made or exception taken thereto in the court below. So far as the record shows, the request was promptly acceded to without any objection either by the prisoner himself or his counsel. Having thus waived the right of objection and taken the chances of a favorable result, it would be contrary to every rule of practice to permit him to take advantage of what was done, even if it was erroneous.

Our right to review proceedings of the court below, in cases like this, is limited to such rulings on points of law or evidence as are excepted to at the time, and made matter of record: Fife _et al._ _v._ Com., 29 Pa,. 429; Hopkins _v._ Com., 50. Pa., 9. It does not appear that the silence of the record, as to any objection or exception to the action complained of, is the result of accident or mere oversight. If such had been the case, the court on application would have so corrected the record as to show what actually occurred on the trial. But, assuming for the sake of argument that timely objection was made and exception taken, we are not prepared to say it would be of any avail to the prisoner. He was not asked, much less compelled, " to give evidence against himself." The sole object of the request was to afford the witness, Mrs. Sharpless, then on the stand, an opportunity of seeing the prisoner and hearing the sound of his voice, so that she might the more intelligently testify whether he was or was not the man by whom she was confronted on the night in question. To hold that this was a violation of the clause, in sec. 9 of the Declaration of Rights, which declares the accused " cannot be compelled to give evidence against himself," would in my judgment be a strained construction of that instrument. If it should be sanctioned, what would prevent a person accused of having stolen property in his possession from successfully interposing a like plea of constitutional immunity and thus thwarting any attempt to search for and recover the property? While the constitutional rights of those accused should never be violated, care must be taken not to deprive the Commonwealth of any legitimate means of detecting and punishing crime. It

is not our purpose, however, to pass upon the question, intended to be raised by these specifications, until it is properly presented. If it should ever arise and be deemed worthy of serious consideration, it will then be definitely settled.

The subject of complaint in the fifth specification is that part of the charge wherein the learned judge says: "You have heard the evidence of the Commonwealth, and it seems to point to this defendant as the man who committed the crime; but it will be for you to say whether the index is sufficiently certain to warrant you in a conviction. I say the evidence *seems* to point to this defendant as the murderer; it undoubtedly does."

This is merely an expression of opinion that was manifestly warranted by the evidence. In immediate connection therewith, as well as in other portions of the charge, the jury was distinctly instructed that the question of the prisoner's guilt was one of fact exclusively for their consideration and determination. In the very next sentence the learned judge proceeds to says: " Whether the evidence is sufficient to satisfy you beyond a reasonable doubt that he is the guilty man, is a question entirely for the jury. I do not intend, if I can avoid it, to give you the slightest intimation of my own judgment, after hearing the testimony, as to what your verdict should be; and if I did, you would not be bound by it." Indeed, throughout the entire charge, which contains a full, clear and accurate exposition of the law applicable to the case, he appears to have been especially careful to impress upon the minds of the jury the fact that the burden of establishing the prisoner's guilt, beyond a reasonable doubt, was on the Commonwealth, and that the question at issue was exclusively for their determination under all the evidence before them.

There is nothing erroneous or improper in those portions of the charge recited in the sixth and seventh specifications respectively. In a certain sense the former may have been " prejudicial " to the prisoner, but that was not the fault of the court. It was the logical sequence of evidence which, if believed by the jury, had a criminating tendency, especially when considered in connection with other evidence in the case. We have already adverted briefly to that part of the charge referred to in both of these specifications. The whereabouts of the prisoner, from Friday morning until Sunday forenoon, and then again from one or two o'clock same night and afterwards, was satisfactorily accounted for by the testimony of the Commonwealth; but, as to where he was from Sunday forenoon until after midnight, the only evidence we have is contained in the testimony of Stephens, to which the learned judge refers; and that tends to locate him in the vicinity of the

[Johnson v. The Commonwealth.]

murder at the time it was committed, without furnishing any plausible reason for his being there. It was for the jury to say, from all the evidence before them, whether he was there or not, and if there, whether the reason he gave for being in the neighborhood at the time was true or false. In view of the evidence as to his whereabouts from the time he was discharged from Moyamensing until the following Monday morning, the story of his having been down the country husking corn would appear to be wholly improbable. All that was said by the court on the subject complained of was fully warranted by the testimony of Stephens and other witnesses.

There is no error in portions of the charge quoted in the eighth and ninth specifications. What is there said by the court relative to the testimony of William Hahn and Lewis Morris Lewis, is neither improper nor unwarranted. At most the former is nothing more than a mere expression of opinion; and the latter is an explanation of Lewis' testimony calculated to assist the jury in understanding its proper application and bearing.

The subject of complaint in the remaining three specifications is the alleged defect of the record, in not showing the presence of the prisoner in court, either "when the jury was sworn," or "when the verdict was rendered," or "during the time of trial." By mere mistake of the clerk these essential facts were omitted from the record, as at first made up, but attention having been called to the omission, the court, during same term at which the motion for new trial was overruled and sentence pronounced, ordered the necessary correction to be made, so that the record would conform to the facts as they actually occurred; and this was accordingly done. If the correction had not been thus made, the defect would have been fatal. The presumption of regularity, etc., which prevails in other cases, does not apply to records of conviction in capital felonies. During the term at which the trial was concluded and while the record is presumed to be in the breast of the court, the power to supply clerical omissions, and so correct the record that it will conform to the facts, cannot be doubted.

The trial throughout appears to have been conducted with due regard to the rights of the prisoner; and we find nothing in the record that would justify a reversal of the judgment.

Judgment affirmed, and it is ordered that the record be remitted for the purpose of carrying the sentence into execution.