Leo P. REISTROFFER, Appellant,

v.

UNITED STATES of America,
Appellee.

W. L. ROGERS, Appellant,

v.

UNITED STATES of America,
Appellee.

Marvin NORRIS, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 15652–15654.

United States Court of Appeals
Eighth Circuit.

July 29, 1958.

Rehearing Denied Sept. 11, 1958.

Morris A. Shenker, St. Louis, Mo., for appellant Leo P. Reistroffer.

Sidney M. Glazer, Berkeley, Mo., for appellant W. L. Rogers (William E. Ginsburg, Boston, Mass., on the brief).

Mark M. Hennelly, St. Louis, Mo., for appellant Marvin Norris.

Theodore G. Gilinsky and Philip C. Lovrien, Asst. U. S. Attys., Sioux City, Iowa (F. E. Van Alstine, U. S. Atty., Sioux City, Iowa, on the brief), for appellee.

Before SANBORN, WOODROUGH, and VAN OOSTERHOUT, Circuit Judges.

WOODROUGH, Circuit Judge.

The appellants in these three separate appeals (submitted here on one record) were indicted together with four other persons for violations of the Mail Fraud Statute, Title 18 United States Code, Section 1341, were tried jointly and were found guilty by the jury. The sentences upon appellants Leo Peter Reistroffer and W. L. Rogers were for five years on each of the counts on which they were found guilty, to run concurrently, and

appellant Marvin Norris was given one year to run the same way.

The basic charge of the indictment was: that commencing on or about the 25th day of October, 1948, and continuing to on or about the 22nd day of January, 1954, defendants devised a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises from some thirty-five named persons and from other residents of the United States and its territories and Canada, who could and would be induced by defendants, to purchase coin-operated vending machines and products to be sold and dispensed therefrom, for cash before delivery, and in each of the thirty-five counts of the indictment the mailing of a letter, done or caused to be done by defendants, on a certain date on and between February 2, 1952, and January 30, 1954, to one of the thirty-five named victims of the scheme for the purpose of executing the scheme, was alleged in the words of the statute.[1]

The indictment was based on defendants' conduct of their business of selling, in large part through the use of the mail, coin operated vending machines and products to be vended therefrom in many cities under the names of National Advanced Vending Company from 1948 to April of 1952, and thereafter up to January 30, 1954, under the name of Continental Merchandising Corporation. They had an office at 410 Main Street, Dubuque, Iowa, (which they moved for a short period of time to Rockdale, a suburb of Dubuque and then returned to the Main Street address) and an organization of traveling salesmen working entirely on commission. They did not have a substantial inventory, nor machinery, nor capital investment, and under their method of operation they sold vending machines and obtained sums of money from a large number of persons in advance of delivering anything to them, except a contract upon a printed form, hereinafter described. They used considerably less than half the money obtained from purchasers to buy coin operated vending machines of a sort from Silver King Manufacturing Company of Aurora, Illinois. That Company shipped the machines to the purchasers who had ordered them. All of the purchasers called by the government as witnesses had failed in their attempts to make gainful use of the machines they received; they lost all or nearly all the money they paid out for them and they testified to pretenses, representations, and promises which induced them to purchase—which were charged in the indictment to have been false and fraudulent.

The trial of the case continued over twenty-five days of elapsed time and some ninety witnesses were examined and approximately 1400 documentary exhibits were introduced. The jury had the office records of National Advanced Vending Company and Continental Merchandising Corporation before it and was informed of the position of defendants in the companies and their functions as well as their interests in the proceeds of the business; the forms and uses of their advertisements; their manuals of instructions supplied to salesmen and used by them; their brochures furnished to salesmen containing testimonial descriptions and photographs of vending machines and men at work on them; and statistical matter. The sales talks of salesmen with the purchasers were testified to at length; the purchasers described their attempts and failures to make gainful use of the machines; a postal inspector gave an account of an

---

1. Section 1341 of Title 18 U.S.C.A. provides:

"Whoever, having devised * * * any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * for the purpose of executing such scheme or artifice or attempting to do, so places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department * * * shall be fined not more than $1,000 or imprisoned not more than five years, or both."

extensive interview in December of 1952, with defendant Reistroffer and correspondence concerning the course the business had taken and was then in contemplation; and a great volume of correspondence between the home office and the complaining purchasers was introduced.

██ None of the appellants testified in their own behalf but the evidence afforded the jury a complete picture of the course of conduct which the defendants followed in making their sales. Having in mind the jury's finding of guilty, we outline from the evidence, considered favorably to the government, the controlling facts substantially supported by the evidence, as follows:

From 1948 to January 1952, defendants' sales included candy, nut, gum-ball, and sanitary napkin vending machines and thereafter the sales were largely confined to coffee vending machines, although sales of other types of vending machines, including machines for vending chlorophyll or Breath Master pellets, were also made. In making the sales, an advertisement like the following would first be published in a city's newspaper:

"Hot Coffee Vendors—Manager Wanted—Man or Woman, to service route of new automatic coffee vendors, put in a coin and out comes a hot, steaming cup of coffee, every cup made individually will turn out a fresh cup every 3 seconds, no selling or soliciting, factory distributor will secure locations and make necessary location arrangements in this area and surrounding territory. Ideal off-hour set up to start. $200 to $400 per week possible part time, full time more. Secured $1785.00 to $5950.00 required now. Please do not waste our time unless you have the necessary capital and positive that you want to go into the coffee vending business, not next month— not next week—Now, as we are definitely going to establish some reliable party in this area immediately. If you can follow instructions and supervision of a large national concern with a Dun and Bradstreet rating, references from Banks, Chamber of Commerce, etc., you should become financially independent within a very short time. Write fully about yourself giving age, phone number, write Box A–256 c/o Journal Tribune." [2]

The salesmen would be assigned about a week after the publication to operate in a hotel or motel room in the city where the advertisement was published and they would immediately get in touch with persons who answered the advertisement. They followed certain prescribed steps indicated by the sales manuals with which they were provided; the first step being to "qualify" the prospect, which meant that after being assured that he could pay cash they falsely pretended to be concerned and made inquiries of him about whether he had qualifications required by the companies for "their" machine operators. Then pursuant to a common plan of sales talk the salesman induced the sale and obtained the cash, either the entire selling price or a large part thereof with an agreement for the balance to be paid C.O.D. On making a sale the salesman receiving the money always obtained the signature of the purchaser on a printed form of order for machines or products to be vended therefrom or both, appearing to be drawn upon the salesman who was referred to by name and as Independent Authorized Distributor for National Advanced Vending Company and later Continental Merchandising Corporation. The order recited that it was complete in itself and contained all the terms of the sale and provided that the merchandise was sold under a warranty of the manufacturer which would "make delivery as soon as it is possible to do so and that the delivery

2. Apparently an advertisement in a Sioux City, Iowa newspaper in January, 1952. Some immaterial variations in this initial advertisement occurred, but the substance of it remained the same.

date will be contingent on the availability of labor and suitable material; that this order shall stand valid the Manufacturer to procure labor and suitable materials, but in no case shall such time exceed three months [later six months] from the date hereof" and that the purchaser was not relying on any representations, promises or warranties not contained in the order.

The coffee machines appear to have cost defendants about $275.00. They sold them at various prices around $590.-00 to $690.00 apiece, transportation charges being paid by the purchaser. Immediately upon closing with the prospect the salesmen reduced the proceeds to cash money and left town for other parts. They always sent the money to the home office and received a 30 or 40 per cent commission, but the purchasers were never able to contact them and neither saw nor heard from them again. National Advanced Vending Company and Continental Merchandising Corporation ordered the vending machines from Silver King Manufacturing Company of Aurora, Illinois, only after they had received the money from the purchasers and that company experimented and ultimately produced and shipped to the purchaser the number of machines ordered by him or her. The defendants caused the shipments of a number of machines to be made out of machines they received back for a nominal consideration from disappointed purchasers who could not use them.

The newspaper advertisement attracted persons, as it was designed to do, who were entirely ignorant and uninformed about the business of selling by vending machine. It conveyed to such persons directly and by implication of the wording that a large, responsible, established, and by necessary implication, experienced, informed and successful company was manufacturing and selling the vending machines; would secure suitable and profitable locations for them; would instruct the purchasers in setting up the machines and servicing them; would cooperate and provide supervision of the

enterprise with the purchasers; and having knowledge from successful experience could, and did, assure the purchasers that they would make large profits from the machines and "should become financially independent in a short time".

When the salesmen met prospects who answered the newspaper advertisement they added the power of the spoken word to the assurances of the printed publication expressed and implied. Their "pitch", as it was called, was enthusiastic, adapted, and intended to make the prospects believe that if they bought vending machines they would forthwith enter into established successful business associated with men who knew the business and would be furnished advantageous locations for the machines and instruction and supervision in setting them up and using them so that large profits would accrue to the purchasers.

The testimony as to the sales talks which the salesmen made to the prospects answering the newspaper advertisements is in the record in narrative form and has been studied. Of course each salesman was alert to adapt to the particular prospect, but in general he followed the line indicated in the newspaper advertisement. He was admonished in his manual of instructions that: "It is best to confine your talks to the business and profits rather than the mechanical end" and the bulk of the coffee machines were sold before any had been tried commercially or even manufactured. It was also impressed upon the salesmen that "the only way to sell this idea is our way" and the uniformity of the sales talks and procedure affords convincing proof that the selling of coin operated vending machines was carried on according to a common understanding and intent among the defendants.

As soon as the money was received at the home office a letter was sent to the purchaser stating: "We have just received from our authorized independent distributor (naming the salesman) his order calling for machines to be shipped direct to you per the purchase order

which you gave him. When new customers place orders with our independent distributors we like to give them a more formal welcome than the mere thanking that courtesy demands. We are therefore writing to express our pleasure in adding your name to our list of friends and operators." Designating the purchaser as one of "our operators" in the letter obviously served to enhance the assurance given by the salesman of the supervision and cooperation the purchaser would receive from the companies.

Some 59 of the purchasers of defendants' vending machines were called by the government and examined at length and there was no evidence that any one of them had ever been able to obtain anything like the earnings promised them from any machines purchased from defendants. Nearly all suffered total loss of all the money they paid—sometimes with tragic consequences. The efforts of individuals to save themselves varied and some gave up easier than others. But the situation in which they found themselves after they parted with their money was not what had been pictured to them and they were uniformly deceived.

Shortly stated, instead of starting "now", "immediately" into supervised "operations at advantageous locations" with instruction and with "automatic machines" as had been promised, the salesman they had dealt with as an "independent distributor" was gone as soon as he got the money. He was not an "independent distributor". There were no machines for "starting now" and in most instances no locations were furnished, or if they were, they were found unsuitable when the purchasers checked them. There was no guidance or cooperation for the inexperienced and ignorant purchasers. The coffee machines were ultimately shipped at the end of a delay, up to six months, and they were found not to be automatic but required several manual operations and many of the purchasers could not make them work properly. Being left on their own without the promised supervision, no one could make any substantial profit with the machines.

The indictment sets forth some twenty specific false and fraudulent representations which defendants would and did make as a part of their scheme and artifice for the purpose of effecting sales of vending machines and products to induce the advancement of money therefor; to lull purchasers into a false sense of security; and to convince them they had no legal recourse when they complained, charged fraud, and demanded their money back, in substances as follows:

(1) & (2). That National and Continental were large, well-established reliable concerns; (3) that they manufactured vending machines; (4) that the cash required of the purchasers in advance was secured by inventory; (5) that the coffee vending machines were available; (6) that the purchasers would be instructed and supervised continuously; (7) that the "factory distributors" or other persons representing a large national concern would secure locations and make necessary arrangements, whereas National and Continental would and did disclaim all responsibility for securing locations; (8) that someone would be on hand to help install and to obtain good locations for the machines; (9) that the company was more interested in selling the products than in selling the machines; (10) that exclusive territory would be granted to purchasers; (11) that the contracts to be signed by the purchasers could be disregarded where they differed from oral representations of the salesmen; (12) that the coffee machines were fully automatic; (13) that National held basic patents on hot coffee vending machines; (14) that it would supply all products made at wholesale prices; (15) that additional machines could be bought to be paid for out of a percentage of the receipts therefrom; (16) that National would supply Bru Coffee that was suitable for the coffee machines; (17) that the hot coffee vending machines had been successfully operated by other purchasers in the past,

were well perfected and little if any mechanical trouble could be expected (when in truth no coffee machine was produced for National or Continental until June of 1952 when seven were completed and defendants sold and collected money from sales of coffee machines from January 1952 on); (19) that (in answer to complaints of purchasers) the salesmen were independent distributors and that National Advanced Vending Company and Continental Merchandising Corporation had no knowledge of or control over their movements, activities and representations; (20) that delays in deliveries beyond the time when deliveries were promised were unforeseen and due to causes occurring since the date of sale.

Our study of the evidence convinces that there is substantial evidence to support the charge of false and fraudulent pretenses, representations, and promises in respect to each of the specifications enumerated and we conclude that there is substantial evidence to support the finding of fact against them necessarily included in the jury's verdict of guilty as to appellants Reistroffer and Rogers.

## Opinion as to Reistroffer and Rogers.

A single very scholarly brief fully documented with citations is filed for these two defendants on their appeals and although it preserves the point that the evidence was insufficient and that acquittal as to them should have been directed at the close of all the evidence on that ground, it does not argue that point beyond a paragraph and we think it is without merit. A request that was made and refused at the conclusion of the evidence for acquittal on the ground of variance will be discussed, infra.

The points elaborated are that the court erred (1) in admitting in evidence and not giving limiting instructions at the time of admitting the sales talks on both sides, i. e. what the salesmen said and what the purchaser said, and the many complaint letters from purchasers to National and Continental together with the replies thereto; (2) in admit-

ting in evidence against defendant Rogers the conversation and letters between Reistroffer and Postal Inspector Nelson; (3) in admitting certain testimony concerning A. J. Kimball, G. C. Kimball, Mary Calhoun, Richard Trayler and Samuel Abbott; (4) in not allowing appellants the right to cross-examine co-defendant Glen Feldman and not allowing defendant Rogers to cross-examine witness Ernest Ellis; (5) in refusing to give certain requested instructions numbered 1, 4, 10, 15, 16, 18, 22, 29, 30, 32, 35, 38, and in failing to give any "theory of defense" instruction and in giving to the jury five instructions set forth in substance and which are discussed; (6) in refusing to grant a mistrial on account of incidents occurring at the trial; (7) in admitting testimony of Leo Sharp concerning Bru Coffee; (8) in not allowing physical demonstration of the coffee machine; and (9) in refusing requested instructions for acquittal at the close of the evidence on the ground of variance between the charges and the evidence.

1. In each of the fifty-nine instances where the government produced a witness to testify to the sale of vending machines made to him or her by National or Continental salesmen after he or she had responded to the quoted newspaper advertisement (or one like it) objection was made to almost every question propounded concerning the sales talk that the talk was hearsay as to all or nearly all of the defendants on trial and therefore inadmissible as to them; that if it should none the less be admitted, a limiting instruction should be immediately given to the effect that the jury should not consider it unless the scheme to defraud was proved as charged and that the proffered matter was proved to be in furtherance thereof. The court overruled the objection. As soon as interrogation of a purchaser-witness was begun by the government and the objection and the alternative request was made, the court took cognizance thereof and immediately made inquiry of the prosecutor whether he had evidence to connect up the testimony to be elicited from the wit-

ness with the alleged scheme to defraud and to show that it was in furtherance of that scheme. The ruling admitting the evidence was not made until assurance in the affirmative was given and the inquiry proceeded, the court declaring that complete instructions would be given later. A typical instance of this procedure with the first purchase-witness was as follows:

"Mr. Mason: Your Honor, I request that you instruct the jury any conversation with defendant Brown is not applicable to us or the other defendants.

"The Court: Well, it is the government's plan to connect this up with the claimed activities of the defendant, and the rule is that the government has to start it some place. Of course, if it is not connected up the Court will instruct the jury to disregard it. They have a right to proceed in this matter and the objection is overruled.

＊　＊　＊　＊　＊　＊

"Mr. Lovrien: ＊ ＊ ＊ the government at this time offers in evidence Exhibit 3–A.

"Mr. Hennelly: Defendants would object to Government's Exhibit 3–A, your Honor, for the reason it is hearsay, proper foundation has not been laid for its introduction into evidence, it at this time would be a violation of the constitutional right of the defendant; if the Court ad-

mits it we respectfully ask the Court to limit the document to the specific defendant.

"The Court: The Court refuses to limit it to this specific defendant. ＊ ＊ ＊ I might state my position: That under the common plan, scheme and design they may offer their proof in support of the charge. Whether it is sufficient that will be for the Court or jury to decide afterwards. Under the circumstances we have a different situation ＊ ＊ ＊ 3–A may be received. You may read this to the jury."

■ We find no error in the course followed by the Court. Where the scheme to defraud included making sales by means of certain false representations conveyed through salesmen, proof of the same misrepresentations being made at widely different places to different persons by numerous agents in the same period, tends to prove that the scheme existed and that the particular salesman was carrying it on. As in the case of a conspiracy in operation the acts and declarations of each participant are admissible against all. The record shows that the conditions on which the court permitted the testimony that would otherwise be hearsay to be considered by the jury were indicated by the court immediately through the inquiries made to the prosecutor; his replies; and the applicable law stated; reiterated constantly for the defendants; conceded by the prosecutor; and fully explained to the jury by the court in the instructions given.[3]

---

3. We find no specific exception taken to instruction number 11 given as follows:

"In the present case the Government has presented evidence as to statements made in the absence of the different defendants. Before you may consider such evidence as to any defendant, you must first find that the Government has by evidence apart from such statements established beyond a reasonable doubt (1) that the particular defendant and the person or persons making the statement or statements had knowingly and intentionally participated in devising the scheme described in the Indictment, and (2) that the statement or state-

ments were made pursuant to such scheme and in furtherance thereof.

"If the Government as to a particular defendant has so established both (1) and (2), you may consider such evidence in passing upon the guilt of such defendant and give it such weight as you feel it justly entitled to.

"If the government has not so established both (1) and (2), then you should reject such evidence and give it no consideration in passing upon the guilt of such defendant.

"The foregoing Instruction relates only to evidence as to statements made in the absence of a particular defendant. It

That the testimony of the purchasers concerning their conversations with the salesmen back and forth were admissible upon the conditions prescribed by the court finds support in the following cases, i. e.: Smith v. United States, 8 Cir., 267 F. 665, 668; Langley v. United States, 8 Cir., 8 F.2d 815, 820; Eddington v. United States, 8 Cir., 24 F.2d 50, 52; Feigenbutz v. United States, 8 Cir., 65 F.2d 122, 124; McDonald v. United Sates, 8 Cir., 89 F.2d 128, 135; Alexander v. United States, 8 Cir., 95 F.2d 873, 880; Grell v. United States, 8 Cir., 112 F.2d 861, 873; Whitehead v. United States, 5 Cir., 245 F. 385, 396; Bogy v. United States, 6 Cir., 96 F.2d 734, 741; United States v. Beck, 7 Cir., 118 F.2d 178, 185; United States v. General Motors Corp., 7 Cir., 121 F.2d 376, 408; Weiss v. United States, 5 Cir., 122 F.2d 675, 680; McDonald v. United States, 77 U.S.App.D.C. 33, 133 F.2d 23, 24.

We find no error in admitting the sales talks and the subsequent correspondence showing the handling of complaints, accusations and demands of purchasers to get their money back. The evidence tended to show the scheme in operation and the participation therein of these two defendants. There was evidence that Reistroffer originated the business and was at all times the head and front of it. He changed his name from Leo P. Reistroffer to John Randall when the business carried on by National began to be carried on by Continental, but he at all times retained his place in it. Appellant Rogers was the sales director in both companies and controlled the salesmen and had the largest shares in the profits of the business by reason of such control.

■ 2. As to the testimony of Postal Inspector Nelson. After identifying himself as having been a postal inspector stationed at Council Bluffs, Iowa, in 1952, Nelson testified that on December 17, 1952, he interviewed Reistroffer in his office in Rockdale and took notes of the interview. He had the notes with him and they refreshed his recollection. When he was asked to tell the court and jury the substance of that interview no objection was made except that a question was raised as to whether a sufficient foundation was laid for the use of the notes. This was settled by the court and the witness proceeded with his answer without objection being made until close to the end of his lengthy direct-examination. Then, when Nelson stated that he asked Reistroffer how he accounted for the fact that practically all of his salesmen have been charged with making false promises, counsel for defendants interrupted to say: "We object to that particular statement and the entire interview for the reason it is hearsay, and a conclusion, selfserving statement, not binding upon the defendant, and ask that it be stricken".

This was not considered a request to review Nelson's entire testimony that had been received without objection or to strike it out. The court simply said: "Overruled". The witness completed the question he had asked Mr. Reistroffer and the answer Mr. Reistroffer gave to it: "You know how salesmen are, they are anxious to make the sale".

It is argued for appellant Rogers on this appeal that the admitting of Nelson's testimony violated the rule as expressed by the Supreme Court in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. They assert that the statements ascribed to Reistroffer were made after the completion of the alleged scheme to defraud.

It may well be doubted that the sole objection to the testimony made by defendants, as above stated, sufficed to direct the court's attention to the point now presented, but in any event there is evidence that defendants' scheme was by no means terminated at the time of the

does not relate to evidence as to statements made by such defendant or in his presence. Evidence as to the statements made by a particular defendant or in his presence may be considered by you in passing upon the guilt of such defendant even though the Government has not established (1) and (2) above set forth beyond a reasonable doubt."

Nelson interview. The defendants continued to sell hot coffee machines by the same means long afterwards. The evidence was that Reistroffer wrote letters trying to induce newspapers to recall stop orders they had issued against defendants' so-called Business Opportunity or Quickie advertising and to continue defendants' advertising. The letters he wrote to the newspapers and the statements he made to Nelson were made with the same purpose in mind; to prevent stop orders against using the mail. They were in furtherance of the same scheme. The court did not err in admitting Nelson's testimony.

3. It appears that witness A. J. Kimball of Pontiac, Michigan, ordered and paid $2085.00 for three coffee vending machines in April, 1952, after answering defendants' usual newspaper advertisement and being persuaded by a salesman named Hamel. Salesman Hamel made representations which included: that the machines had been widely used on the west coast; that they were in production on a line of machines; that at the time they were practically all sold, "but if I was interested in obtaining some machines quickly he would take my order, and assured me that they would be shipped out of the machines that were on the present production line"; that the machine was so built that it would not require any plumbing connections and that's why this machine was so successful in the use in Universal Studio on the west coast; that the machine would use instant dry coffee; that the machine would be selective as to whether the purchaser could get coffee that was black or with sugar or both sugar and cream; that the purchaser would get the coffee just the way he wanted it; and that there was a machine in operation in a theater in Detroit.

In the course of extended connected correspondence with National's home office (after he had made his purchase and failed to receive any machines), Kimball was told in a letter from that office and dated May 16, 1952, that his best opportunity to see the machines would be at the plant of Silver King Corporation in Aurora, Illinois, and that "once you have seen our vendor, I am sure you will agree that it is the best on the market". Kimball said: "I went to the theater in Detroit and there wasn't any machine there". He caused his brother George to go to Aurora and the brother testified that he went to the Silver King plant and found that no coffee vending machine had been produced, none was being produced, and that only a little experimentation with them was going on and so reported. Shortly thereafter another of the newspaper advertisements that had appeared in the Detroit Free Press appeared in the Pontiac Press. When Kimball answered it a salesman named Gorden came to Kimball's office at a time when his brother George was there. Kimball testified: "The conversation [with Gorden] went along the same line it had with [salesman] Hamel. [Gorden] told me * * * that they had these coffee machines * * * in production ready to make shipment * * and he told me a good many of the same things Mr. Hamel did, it was portable, used instant dry coffee, it was selective, as to cream and sugar. He also wanted to go through his other sales statistics as to figures and earnings, etc., but I stopped him at this point when he made the essential facts that I knew weren't true."

Kimball accordingly reproached Gorden and threatened to call in the District Attorney, but Gorden begged him to call Mr. Reistroffer instead. Gorden made a telephone call to Mr. Reistroffer in Dubuque and explained to him what had happened in Kimball's office and that Kimball was claiming false representations had been made to him. Kimball then talked to Reistroffer on the telephone and repeated his claims and in the end Reistroffer, having insisted there was a mistake and misunderstanding, promised that if Kimball would write in detail what had happened in the office and have the brother, George, write a complete report on what he had found

out—immediately upon receipt of that information, he, Reistroffer, would make refund of the amount Kimball had paid for the three machines.

Kimball complied and wrote to National, attention Mr. Reistroffer, stating his charges of misrepresentation made to him by Hamel, which, following the newspaper advertisment, had induced his purchase of three vending machines. To which Reistroffer responded by letter that he was writing Hamel and Silver King for a full report. Telephone conversations and several letters then passed between Kimball and Reistroffer and in the end Reistroffer wrote that he was turning Kimball's file over to "our attorneys" and that libel proceedings would be instituted against him and that he would not answer any more of Kimball's letters, etc. The whole correspondence, verbal and written, taken together permitted the inference that although Reistroffer was fully informed of Kimball's claim that National had obtained Mr. Kimball's money by false pretenses, representations and promises, he, Reistroffer, was going to keep it; that he refused to make any explanation of the questions Kimball put to him and that he was threatening Kimball with a libel action and refusing to correspond further with him.

Mr. Kimball also testified that he finally received three coffee vending machines some six months after his payment and that they were not as represented by either Hamel or Gorden and "when we tried to operate the machine the results were very unsatisfactory". "In the first place we had to use liquid concentrate in the machines which had been represented to me to use instant dry coffee * * * we couldn't produce anything that tasted like a satisfactory coffee from this liquid concentrate. We didn't sell any."

In the course of the talks and letters in the Kimball transaction Reistroffer called some assertions of Kimball's "threats, lies and intimidations" and Kimball charged that representations made to him were "false and fraudulent" and on this appeal complaint is made against admitting the characterizations made by Kimball into evidence.

Somewhat similar impropriety of expression occurred in the course of proving the sale transactions with Richard Traylor, Mary Calhoun and Samuel Abbott. It is argued that the character of defendants was in that way erroneously allowed to be brought in issue. But in each instance the court gave careful consideration to the objections and motions to strike and for mistrial and by rulings and directions to the jury fully protected the defendants from prejudice. There is not the slightest reason to believe that the jury could have based any of its findings against any defendant on any mere characterization by a witness of a defendant's representations or of a defendant himself. We find no abuse of discretion or unfairness in the trial in respect to admitting testimony complained of under this point.

4. Complaint is made that defendants were denied the right to cross-examine the co-defendant Glen Feldman, who testified as a witness, and Ernest Ellis who was vice president of the Silver King Corporation which manufactured the vending machines for National and Continental and was called as a witness by defendants.

■ (a). As to Feldman, we do not find that any question propounded to him was excluded on the ground that it was cross-examination, nor that the court erred in excluding any question put to him.

(b). As to Ellis, the record shows that he was called and examined at length on direct examination by attorney Mason (attorney of record for defendants Reistroffer and Sheean) on behalf of all defendants and then after brief cross-examination further and at length on re-direct examination for all defendants by Mr. Mason. He was then again cross-examined by government counsel and again on re-direct (a third time) by Mr. Mason. Then Mr. Hennelly (of counsel for defendant Feldman), who had repeatedly made examinations of witnesses

which were always deemed to be for all defendants, continued the examination of Ellis for all defendants. After a question or two Mr. Hennelly asked a leading question obviously calling for a "yes" answer favorable to defendants and the witness answered "Yes". The prosecutor belatedly interposed an objection on the ground that the question was leading and suggestive and colloquy ensued in which the court observed: " * * * You counsel were informed * * * you are on direct (examination) * * * the Court doesn't regard this as cross-examination, where it is not in fact cross-examination the Court cannot regard it as such. * * * ."

Later there was further colloquy about the subject of cross-examination, but no claim was made that the witness had given any damaging testimony against any defendant in respect to which or on account of which any defendant wanted to cross-examine him. There was no indication that he was a hostile witness as to any defendant. He was not prevented from answering any question propounded to him on the ground that it was cross-examination.

Appellants, in respect to this point, rely on Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624, where a prisoner in custody was called as a witness by the prosecutor and gave damaging evidence against the defendant. Upon cross-examination by defendant questions seeking to elicit the witness' place of residence were excluded. The Supreme Court reversed. It observed that the purpose of the questions were to show by such facts as proper cross-examination might develop that the testimony was biased because given under promise or expectation of immunity or under coercive effect of detention of the witness by officers of the United States which was conducting the prosecution against defendant. The trial court cut off in limine all inquiry on a subject with respect to which the defense was entitled to reasonable cross-examination. There was no analogous situation here and we find that there was no erroneous denial by the court of any right of cross-examination.

5. The refusal of requested instructions. The instructions requested were 39 in number and complaint is here made of the refusal of thirteen of them, as enumerated. The court gave 41 numbered instructions and we have made comparison between the thirteen refused and those given and counsel for the government have also analyzed and put in parallel columns the instances where the refused instruction was corrected as stated by the court and included in substance in the instructions that were given. Requested instructions numbered 1, 4, 10, 15, and 22 were so covered. Requested instructions numbered 29, 30 and 32 refused, simply attempted to have the court comment favorably to defendants on parts of the evidence. In those numbers the requests were that the jury be told that they might consider three of the provisions of the purchase order form as three circumstances indicating that defendants did not authorize any representation not contained in the form. But other proven circumstances tended to rebut such an inference. The issue was for the jury and the court responded to the three requests, 29, 30 and 32, by adding the last 2 paragraphs to its instruction number 9 to make it read as follows:

"Where two or more persons knowingly and intentionally participate in devising a scheme to defraud or to secure money or property by means of false pretenses, representations or promises, and in pursuance thereof and in furtherance of such scheme one of the participants secures the signature of a person sought to be defrauded to a document by means of false pretenses, representations or promises, the making of such false pretenses, representations or promises becomes the act of all the participants in the scheme and each participant is a party to securing such signature by means of false pretenses, representations or promises. One who is a par-

ty to securing a signature to a document by means of false pretenses, representations or promises is not relieved of chargeability for such pretenses, representations or promises because of the provisions of the document.

"Where a person has not knowingly and intentionally participated in a scheme of the nature referred to, he is only chargeable with the false pretenses, representations or promises made by himself or which he authorized, approved or ratified. Unless a person has knowingly and intentionally participated in a scheme of the nature referred to, he may not be held to have authorized false pretenses, representations or promises unless it first be proved that he had actual knowledge of the making of them.

"A jury in determining whether a person has actual knowledge of the making of false pretenses, representations or promises may and should consider the provisions of the document or documents submitted to or otherwise coming to such person's attention together with all of the other facts and circumstances shown by the evidence.

"A jury in determining whether certain claimed false pretenses, representations or promises were in fact made by the person alleged to have made them in a certain transaction may and should consider the provisions contained in such document together with all of the other facts and circumstances shown by the evidence."

The court thereby fully covered by proper declaration of law all that defendants properly requested in their number 29, 30 and 32 requests and they seem to have no longer maintained their objection to No. 9 as given by the court.

Requested instructions 16, 34, and 35 were fully covered by instructions given and 38, purporting to state the "position" of defendant Reistroffer "that he did not

intend to defraud anyone; that he did not intend to deceive anyone", etc., etc., was not a proper instruction based on or related to any evidence. The instruction that the defendant had plead not guilty and that the burden of proof beyond reasonable doubt was on the government covered all defendant was entitled to.

As to requested instruction number 18 to the effect that "it is a very prevalent thing in the course of business to exaggerate the merits of goods people have to sell and within any proper and reasonable grounds such a practice is not criminal, etc.," the court did not abuse its discretion in refusing to give it. No charge was laid on any mere exaggeration or puffing of goods for sale, none was relied on by the government and no instruction given permitted conviction on such grounds.

We find no error in the refusal of the said numbered instructions requested by defendants or in the failure to give any theory of defense instruction.

6. The incidents occurring at the trial upon which mistrial was demanded and refused were trivial.

(a) A witness could not identify by sight the defendant Bramblet who was standing before him, but said: "Probably if I could hear his voice I could maybe tell more about it, it was in '52." The prosecutor said: "Count to five please". Mr. Hennelly objected and asked that it be stricken and that the jury be instructed to disregard it. The court immediately sustained the objection and ordered it to be stricken and the jury to disregard it. Whether Mr. Bramblet had any objection does not appear. There was no answer and no possible prejudice to defendants. Johnson v. Commonwealth, 115 Pa. 369, 9 A. 78; Beachem v. State, 144 Tex.Cr.R. 272, 162 S.W.2d 706; State. v. Taylor, 213 S.C. 330, 49 S.E.2d 289; State v. Griffin, 129 S.C. 200, 124 S.E. 81, 35 A.L.R. 1227; Inbau, Self Incrimination, 49–51; Wigmore on Evidence, Section 2265.

(b) Witness Rayner in testifying to a telephone conversation between

himself and Reistroffer included as part of the conversation: "I says, you are nothing but a damn ex-convict". The court promptly instructed the jury to disregard it and admonished the jury: "There is no proof of the claims made, apparently [in] anger and argument over the phone." The court further stated in the absence of the jury: "The court heard the whole thing—saw the jury. They regarded him [the witness] with tolerant amusement. The court says that is one of the inadvertent statements which come in occasionally and there will be no mistrial."

There was no abuse of discretion by the court in its treatment of what was actually a mere rudeness on the part of the witness.

After presenting the contentions concerning refusals of the court to give requested instructions, which contentions only incidentally included complaints against some of the instructions that were given, the brief for the two appellants takes up the instructions which the court gave and upon analysis of them it is earnestly insisted that they include fundamental errors so prejudicial to these defendants as to have deprived them of a fair trial.

These arguments appear to us to derive mainly from the position asserted for these appellants that, although the indictment charged only one scheme to defraud, there were under the proof three possible schemes and that there was consequently a fatal variance.

They made no claim of variance at the conclusion of the government's evidence, but included a general charge of variance in the motions for acquittal at the end of all the evidence. It is true that in this case there was proof that defendants sold several different kinds of vending machines; that they used two different corporate names; that defendant Reistroffer went under different names; that a product called Bru Coffee they sold for use in the coffee machines was unfit; and that many different misrepresentations were made to effect sales. But we find no scheme proven that was segregated and unrelated to the general inclusive scheme charged in the indictment fraudulently carried on by repeating the same steps of procedure and actively participated in by all of these appellants.

The reliance of the appellants in respect to their claim of variance is largely upon Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. That was a conspiracy case where the convictions were under a single general conspiracy charged. But the government admitted that the evidence proved some eight or more different ones of the same sort, connected only because they were executed through a key man common to all. Different persons seeking to obtain money by fraud from the government obtained his help at different times but independently of each other. The Supreme Court reversed the convictions on account of the variance and the resultant unfairness of the trial as to individuals.

In this case the scheme as charged and proved was sufficiently unitary so that each of these appellants was connected with and bound by the proof that was offered and received against them or either of them. They all participated in the common scheme to sell vending machines and products to be sold therein. Neither of them is entitled to reversal on account of any variance between the charge and the proof or on account of alleged error in the instructions given by the court and not excepted to at the time.

7. As to the Bru Coffee. Under this point error is assigned in respect to admitting the testimony of Leo R. Sharp and an exhibit produced by him, over defendants' "hearsay objection" and "request to limit".

Sharp was employed as a saleman for National by defendant Rogers personally and received his instructions for selling from Rogers. His contract with National, which he signed after speaking to Rogers, was introduced in evidence. It referred to him as authorized regional director distributor and was intended to cover all agreements and conditions for

the purchase and sale of vendors. It did not specify coffee vendors. Mr. Rogers later on in the next year showed him what they had planned for him was to sell their Bru Coffee. They were perfecting it to be used in their coffee machines. Sharp sold it by the same method used for selling the vending machines. He said: "When the prospective purchaser answered the ads they answered by letters to the newspapers and [we] obtained our leads from them." "I had some of the coffee myself and there was something wrong with it. It was full of sediment. If you stirred it it would sour and ferment. Take the lid off it it would sort of explode like with the gas that had accumulated on it. * * * the newspapers over the State of Florida published notices to the effect the coffee had been condemned * * *." and the witness gave all that he had to the State Officers.

It is argued that Sharp's testimony was erroneously admitted on account of variance; which as stated, we do not sustain, and also, that his testimony as to the coffee being condemned and as to the newspaper notices was not the best evidence.

 But what the witness said about the coffee being condemned and about newspaper notices was merely explanatory of the actions taken by him. He surrendered the coffee he had on hand to the Florida Officers. His actions followed upon information he received from the newspapers and a visit from Florida Officers. His testimony was not offered to prove the contents of the newspaper articles or any legal right of the officers. But his testimony as to his action was competent and the collateral matter explanatory of it was not barred by the best evidence rule nor by the hearsay rule. Scullin v. Harper, 7 Cir., 78 F. 460; United States v. Aluminum Company of America, D.C., 35 F.Supp. 820, 827.

 8. The defendants introduced a coffee machine in evidence and their expert explained it at length and in detail to the jury, but the court denied defendants' request to permit him to demonstrate the operation of it before the jury. That ruling of the court is assigned as error. The court said that it did not want the demonstration because it could not be a matter of record. Counsel for the government also argue here that a single demonstration by the engineer who designed and constructed the machine would not be probative of how it would function in public service. The appellants argue persuasively for their contention that permission should have been given the expert to operate the machine. But the matter was within the court's discretion and we find no abuse of it.

Our conclusion on consideration of all the points of error, including some which we have considered but have not found necessary to discuss, is that the conviction of these two appellants is supported by the evidence and that a fair trial without error was accorded them.

### Opinion as to Marvin Norris.

 The prosecution against Norris was on the ground that he knowingly participated in the scheme to defraud, described in the indictment, as one of the salesmen for the companies who induced sales of vending machines by means of false pretenses, representations and promises alleged. It was not claimed that he wrote any of the count letters set forth or composed any of the advertisements. He was convicted on only four of the counts and sentenced to one year. He was represented at the trial by counsel appointed for him as an indigent defendant by the court and has appealed in forma pauperis. He has been ably and diligently defended in both courts. He did not testify in his own behalf but had the benefit of the objections and contentions that were urged against practically each and all the steps taken by the government in making out its case. He also had the benefit of the evidence adduced by the defendants and of certain witnesses called in his defense at government expense.

Early in the proceedings demand was made in his behalf for a separate trial which was denied and with all the evi-

dence taken at the trial now before us, it does not appear that the denial was erroneous or resulted in any unfairness to him.

Having the benefit of his own counsel he was enabled to and did obtain full consideration by the court of every matter of defense to the charge against him that arose in the proceedings. The court did not fail to individualize his case from the group.

The evidence concerning the participation by Norris in the sale of vending machines as a salesman for the companies was confined to the year 1952. A purchaser of the machines named Joe Diehl testified that Norriss accompanied the defendant salesman Kenneth Paul Brown, then going under the name of Cox, to Diehl's dwelling house on May 6, 1952, and participated in selling some of the vending machines to Diehl. There was discussion between the two salesmen in Diehl's presence as to who should make out the purchase order.

Another purchaser of the vending machines named Harry Rayner testified that a few days after defendant Brown, going under the name of Norris, had sold him some of the vending machines, he went looking for "Norris" at the hotel where the sale had been made and he got in touch with defendant Norris in the hotel lobby on about May 4, 1952. The conversation there included a question by defendant Norris: "What are you bellyaching about you have got the best deal in San Diego." Rayner said: "I'm going to find Mr. Norris.", and the reply of the defendant was that Norris had gone to Los Angeles.

A Mrs. Ruth Dobson testified that she answered the newspaper advertisement in a Spokane paper and that on about July 5, 1952, defendant Norris induced her to buy vending machines by means of false representations as alleged in the indictment. She was positive in her identification of Norris and said she saw him sign the purchase order for the machines.

The witness L. P. Leid testified that after answering defendants' newspaper advertisement in the San Francisco Examiner he met defendants Norris and Brown in a room in the Drake Hotel and that Norris was the one who induced him to purchase three coffee machines for $2085.00 on June 6, 1952, by means of false representations such as are set forth in the indictment. He was positive that Norris and not Brown did the selling. He said Brown left the room. Leid also said that Norris signed the purchase order.

The witness Martin E. Underwood, who bought into the Continental Company, testified that he met a Mr. Norris for a few minutes at the office of Continental and believed defendant Norris to be that person. He was not sure. The person was with defendant Brown.

Evidence adduced by Norris tended to prove an alibi for a part of the time when the witness said he was selling the machines. A witness for whom he obtained subpoena testified that he was the attorney for Mrs. Dobson who was present at the closing of her purchase of vending machines and that Norris was not the salesman in that transaction.

 The members of this Court are unanimously of the opinion that the evidence adduced against defendant Norris was sufficient to constitute a prima facie case and to support the verdict and judgment against him. If believed, it established that the gist of the scheme to defraud was brought to his knowledge and that he joined in with the principal schemers to accomplish their purposes. It is not necessary for the government to prove that he was one of those who originally devised the scheme. When he joined in the selling and the misrepresentations and deceptions, although in comparatively few instances, he brought himself within the provisions of the statute.

 It is earnestly contended that the court erred in refusing Norris' request to issue a subpoena at government expense for an expert witness, George Swett, as to whom defendant deposed that he fully expected him to testify that in his expert opinion the handwriting

contained on the purchase orders concerning which Ruth Dobson testified and also the handwriting on the purchase order which L. P. Leid testified about is not the handwriting of the defendant Marvin Norris.

It appeared to the trial court that since Norris chose not to take the witness stand and produce samples of his handwriting and in the court's long experience, experts on handwriting could not be expected to give an opinion without laboratory tests and sure bases for comparisons, there was too much uncertainty to justify the expense of bringing the expert witness from St. Louis, where he lived, to the place of trial at Waterloo. It is also pointed out for the government that proof that the particular signatures referred to were not in the handwriting of Norris even if established would not have constituted a complete defense to the charges and the evidence against Norris.

 It is well settled that Rule 17(b), Federal Rules of Criminal Procedure, 18 U.S.C.A., under which the motion for subpoena was made, does not accord the indigent defendant an absolute right to subpoena witnesses at government expense. There is and must be wide discretion vested in the District Court to prevent the abuses often attempted by defendants. This Court will not disturb the exercise of the discretion unless exceptional circumstances compel it. Gibson v. United States, 8 Cir., 53 F.2d 721, 722.

The majority of this Court is convinced that the refusal of the District Court to subpoena George Swett at government expense does not present such abuse of discretion and prejudice to Norris as to require reversal of the judgment against him.

 It is also contended for Norris that the prosecutor was guilty of misconduct in expressions he used in his final argument to the jury and that the court erred in failing to award Norris a mistrial as requested on account thereof.

The record shows that in his address to the jury counsel for Norris made an argument to the effect that the government ought to have consulted handwriting experts in the preparation of the case against Norris. In reply the prosecutor said that Norris had the privilege of calling such experts. In response to objections and a motion for mistrial, the District Court observed that it was counsel for Norris who had brought the subject of handwriting experts into the jury argument and that the prosecutor had followed. The prosecutor was directed to go no further with it. The jury was directed to disregard what was said about it on both sides. The motion for mistrial was denied.

The majority of the Court is of the opinion that this incident of the trial occasioned no such prejudice to Norris as to justify reversal of the judgment against him and that the refusal of the court to grant a mistrial on account of it was not erroneous.

Counsel for Norris has covered many points in his brief that have been discussed in the opinion as to Reistroffer and Rogers, and other points which have been fully considered but have not required discussion. We find no error requiring reversal of the judgment against Norris and it is affirmed.

Affirmed as to defendants Reistroffer and Rogers.

Affirmed as to defendant Norris.