**UNITED STATES of America,**
**Appellee,**

v.

**William Eugene SHEEHAN, Robert Lee Sheehan, Joseph Andrew Sheehan,**
**Appellants,**

**and**

**LeRoy Junior Westberg.**

**No. 19559.**

United States Court of Appeals, Eighth Circuit.

June 8, 1970.

Rehearing Denied July 7, 1970.

Certiorari Denied Oct. 12, 1970.
See 91 S.Ct. 66.

Patrick J. Foley, of Rerat, Crill, Foley & Boursier, Minneapolis, Minn., for appellants and filed supplemental brief. Original brief of appellants was filed by John Connolly, III, of Connolly, O'Malley & Conley, and Raymond Rosenberg, of Bellizzi, Rosenberg, Rosenberg & Strickler, Des Moines, Iowa, who were subsequently relieved of further obligation to appellants.

Allen L. Donielson, U. S. Atty., Des Moines, Iowa, for appellee; Claude H. Freeman, and Richard J. Barry, Asst. U. S. Attys., on the brief and supplemental brief.

Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.

MEHAFFY, Circuit Judge.

This appeal is from the conviction judgments of William Eugene Sheehan and Robert Lee Sheehan, brothers, and Joseph Andrew Sheehan, their cousin, for having used the mails in a scheme to defraud customers in the sale of hearing aids in violation of 18 U.S.C. § 1341.

The three Sheehans and a fourth person, LeRoy Junior Westberg, a former brother-in-law of William and Robert, were indicted by a grand jury on December 21, 1967 on twenty counts of mail fraud. All entered pleas of not guilty but Westberg later changed his plea to guilty on two counts and was sentenced to three years' imprisonment on one of them, given a suspended sentence on the other and placed on three years' probation. He does not appeal. When the Sheehans were tried, the trial judge, The Honorable Roy L. Stephenson, withdrew three counts from the jury's consideration and seventeen counts were submitted to the jury. William and Robert were each convicted on sixteen counts and acquitted on one count, and Joseph was convicted on nine counts and acquitted on seven counts. William and Robert were sentenced by the court to a term of five years' imprisonment and a $1,000.00 fine on Count I and five years' imprisonment and a $1,000.00 fine on each of the other counts, the prison terms to run concurrently, and payment of the $1,000.00 fine on any one count to constitute payment of the fine on all of the counts. Joseph was sentenced to three years' imprisonment and fined $1,000.00 on Count I and received the same sentence and fine on each of the other eight counts, the prison terms to run concurrently and the payment of the fine on Count I to constitute payment of the fine on all counts. We affirm.

The defendants were involved in one or more of four companies at various times, namely, the Transistor Hearing Aid Company, Central Iowa Hearing Aid Center, Electronic Hearing Aid Company, and Stereophonic Sound Company. There was evidence to the effect that in some instances they sold used, recased hearing aids which they represented as new and charged an exorbitant price for them; that they promised free service for varying lengths of time extending up to the life of the customer, but did not provide it satisfactorily; that they claimed to be representatives of various hearing aid manufacturers which they did not represent; and that they repeatedly sold the same person a different hearing aid (in some instances several times a month or several times a year) on the representation that it was a newer model, or was more powerful, or would work better, when actually it did not, usually taking the previous one in on a trade but charging an exorbitant price for the difference.

Defendants' customers were in the age group from approximately seventy to ninety years, and many of them lived alone. One customer paid over $7,000.00 to two of the defendants and their companies in approximately ten months, and others paid over $2,000.00 and $3,000.00 within a period of two or three years or less.

William Sheehan became the sole owner of Transistor Hearing Aid Company in 1958. Robert and Floyd, his brothers, were salesmen for the company and Joseph, his cousin, was also a salesman there for about a year, beginning in 1959. In 1960, Robert Sheehan and Joseph Sheehan owned and operated Central Iowa Hearing Aid Center for several months. In 1961, Robert purchased Electronic Hearing Aid Company but sold it to Joseph in July, 1962 and acquired Stereophonic Sound.

Original counsel represented defendants during the trial and on appeal until after the original brief was filed. At that time another firm was substituted as counsel for defendants and that firm filed a supplemental brief and made the oral argument before this court. The original brief argued the following points:

I. That the court erred in admitting into evidence Exhibits 30–1, 30–2 and 30–3 and the testi-

mony of Lowell Nicholas relating thereto.

II. That the court erred in admitting into evidence Exhibits 24-7, 24-8 and 24-9 and the testimony of John Widick relating thereto.

III. That the court erred in allowing the jury to find a "scheme and artifice to defraud" from defendants' failure to answer correspondence directed to said defendants by persons containing inquiries concerning hearing aids purchased or the settlement of claims against the defendants.

In addition to the above arguments, present counsel asserted the following in its supplemental brief:

I. That the evidence proves that each defendant and each salesman operated separate from a common scheme to defraud; that this constitutes a fatal variance from the indictment, which alleged a single scheme and artifice to defraud; and that each defendant was materially prejudiced by evidence which was received for consideration by the jury but was demonstrably not admissible against him.

II. That certain other exhibits were improperly received in evidence by the trial court without adequate foundation.

III. That trial and appellate counsel first retained were inadequate.

■ We find no merit in defendants' first contention that the court erred in admitting into evidence Plaintiffs' Exhibits 30-1, 30-2 and 30-3 and the testimony of Lowell Nicholas, the General Manager of the Better Business Bureau, relating thereto. These were the permanent files of the Bureau pertaining to three of the companies which were owned by and/or which employed defendants at various times during the period involved. Exhibit 30-1 pertains to Transistor Hearing Aid Company, Exhibit 30-2 to Central Iowa Hearing Aid Center and Exhibit 30-3 to Electronic Hearing Aid Company.

Exhibits 30-1, 30-2 and 30-3, as offered, contained the complaints of various customers of defendants which were written to the Better Business Bureau concerning misrepresentations in connection with the sale of hearing aids by defendants, as well as the notification of defendants of the complaints and their responses thereto, but the complaints themselves were not permitted to go to the jury. Defendants objected to the admission of the exhibits on the ground that "they appear to be hearsay as to these defendants" and that they have "no probative value with respect to these three defendants." After a discussion at the bench among the court and counsel, the record reflects the following:

"The Court: Would the government state the purpose of the offer?

"Mr. Williams: Yes, Your Honor. The exhibits are being offered for the purpose of showing that the defendants were advised that complaints were being made about their activities and their business operations, and that they were aware of the complaints that were being made against them. Thus, bearing upon their intent in subsequent transactions.

"The Court: All right. They will be admitted for that purpose. And the Court cautions the jury at this time: I think you recognize that the fact that a complaint is made does not necessarily indicate that the complaint has validity. In other words, the people who made the complaints are not here before the Court to be examined in front of you so you can determine whether the complaints had validity. The only purpose of allowing this evidence to be introduced is for the purpose of showing—as the government has made its offer here—showing that there were complaints made, and what action if any was taken by the defendants. I assume that is covered in the files, is that correct?

"Mr. Williams: Yes, Your Honor.

"The Court: All right. So, Exhibits 30–1, 30–2 and 30–3 are received for that purpose."

At the close of the testimony and prior to the giving of the instructions, the court asked the defendants' attorney and the government's attorneys to look over the files and remove all complaints, since all of the complainants were not present for cross-examination but to include the letters from the Better Business Bureau notifying the defendants of the complaints and their responses, if any, thereto.[1]

Photostatic copies of the letters selected by counsel were then made at the court's direction for submission to the jury. The record relevant to this is as follows:

"The Court: * * * I think, gentlemen, you agreed that the material from the file in Exhibits 30–1, 2 and 3 that is relevant, would be photostated, and that has been done?

"Mr. Wright: [Defense counsel.] That was the agreement between counsel for the defendants and the government.

"Mr. Williams: [Government's attorney.] And it is being done now by the clerk of court.

"The Court: I want to say for the record that the Court noted in the file —and I'm not saying that if it were relevant and material in some respects that it would necessarily have to be kept out, but the Court felt that the Court should lean over backwards in regard to Exhibits 30–1, 30–2 and 30–3, to see that it should be removed, and not have the jury consider highly inflammatory letters that were in the file.

"Mr. Wright: I believe, Your Honor, you already pointed out that the defendants should have been afforded an opportunity to cross-examine any of the complainants in there; and that was another reason for withdrawing it.

"The Court: That's right. Some of them were repetitious of witnesses who did appear. I glanced through it. Mrs. Wine repeated some of the things on the stand. Well, I think this keeps it in proper balance. There is nothing in there now that doesn't have a strong bearing on the relationship or lack of relationship between the parties; and this is the main purpose for having had these files checked." [2]

1. The trial court's comments are as follows:

"Gentlemen, my instructions are completed. If you gentlemen want to take a look at these records of the Better Business Bureau—you three lawyers—you may bring them to my chambers and look at them. My thought is that that part of the records which might have any bearing whatsoever on the relationship between each of these defendants and LeRoy Westberg, the four of them all told, or lack thereof, is material and relevant to the issues in the case, regardless of whatever else the file might show.

"On the other hand, it is the desire of the Court, and I do want to emphasize to counsel that I do want to remove from the files all complaints, because the Court recognizes that people make complaints, and those people aren't here to be cross-examined. And it is relevant and material that people did

make complaints, and those complaints were not answered. And to the extent that some letters might refer to a complaint being forwarded, or some notation about it, I have no desire to have that removed. What I'm trying to get away from is inflammatory type letters that some citizens might have written who were angry about their hearing aids as such. * * * "

2. Typical letters appearing in the Better Business Bureau files, taken from Plaintiff's Exhibit 30–1, are as follows:
"June 22, 1959
Mr. Robert L. Sheehan
Transistor Hearing Aid Company
3117 Cambridge
Des Moines, Iowa
　　　Re: Mr. E. H. Miller
　　　　　Truro, Iowa
Dear Mr. Sheehan:
In reviewing my follow-up file, I note that we haven't had an answer to our letter to

After the jury had left the courtroom to commence deliberations and before the exhibits were submitted to the jury, the following transpired:

"The Court: As to Exhibits 30–1, 30–2 and 30–3, have you gentlemen gone over them?

"Mr. Wright: We have. I have gone over them.

\* \* \* \* \* \*

"Mr. Williams: Your Honor, we have examined Plaintiff's Exhibits 30–1, 30–2 and 30–3 and we are agreed that they are in the agreed condition to go to the jury.

"The Court: Is that correct, Mr. Wright?

"Mr. Wright: That's correct, sir."

Furthermore, the jury was again properly and adequately instructed on this point by Instruction 17A given by the court, as follows:

"In this case Mr. Lowell Nicholas, General Manager, Better Business Bureau of Des Moines, testified concerning complaints he had received from various customers of the defendants and Hearing Aid Companies, set out in the indictment. His files marked Exhibits 30–1, 30–2, and 30–3 were received in evidence. This testimony and evidence was received for the purpose of showing the relationship or lack of relationship existing between the defendants and the various companies involved. Evidence as to complaints and actions taken thereon is to be considered by you only for what bearing, if any, it may have as to the knowledge, intent, motive or purpose of the defendants, and as to the existence, if any, or lack thereof, of a devised scheme to defraud or to obtain money by means of false or fraudulent pretenses, representations or promises, and for no other purpose."

In United States v. Press, 336 F.2d 1003, 1011 (2nd Cir.1964), the court said that "evidence that there had been complaints which were called to appellants' attention was relevant on the issue of appellants' intent and good faith," and that "the inference might readily be drawn that, since appellants knew that members were being misled by solicitation literature and that there was general dissatisfaction with the manner in which Buy-Rite conducted its affairs, continued operation despite this knowledge showed the existence of a scheme to defraud." [3] The court further stated that testimony concerning the receipt of complaints was admissible irrespective of its truth since the fact of the assertion was itself relevant. See 6 Wigmore, Evidence § 1766 (1940 ed.).

you on June 15. [A copy of the complainant's letter was forwarded to Mr. Sheehan with the June 15th letter.] Would you please give this matter your attention as soon as possible? We'd appreciate it.
Cordially yours.
Better Business Bureau of Des Moines, Inc.
Lowell P. Nicholas
General Manager"
"June 25, 1959
Mr. Lowell P. Nicholas
General Manager
Better Business Bureau of Des Moines, Ia.
246 Insurance Exchange Building
Des Moines, Iowa
Dear Mr. Nicholas,
I am sorry that I haven't answered your letter sooner, but the consultant Robert L. Sheehan was on vacation and I didn't know the particulars on this matter until I talked to him. We will take care of Mr. Miller of Truro, Iowa immediately. Yours truly,
/s/ William E. Sheehan,
  William E. Sheehan,
  Transistor Hearing Aid Co. of Iowa.
WS:SB
Inclosed our check for dues."
After follow-up letters of July 15, August 20, August 31, and September 8, 1959, without results or further response, Mr. Nicholas telephoned concerning the complaint and Sheehan told him that one of the brothers who took the order was in California but he admitted liability and said they would repay Mr. Miller's money.

3. To the same effect, see Reistroffer v. United States, 258 F.2d 379, 388 (8th Cir. 1958), cert. denied, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959).

Although defendants contend that there was no showing that they actually knew of some of the complaints, it was clearly shown that they knew of most of them. In United States v. Press, *supra,* the defendants contended that there were approximately twenty per cent of the complaints which had not been called to their attention and that it was error to receive testimony concerning them. The court noted that "there were member complaints in substantial volume which *were* called to Buy-Rite's attention" and held that "because of the prominence of the complaints called to Buy-Rite's attention that were properly in evidence, the fact that there was mention of other complaints not specifically called to Buy-Rite's notice did not constitute error sufficiently prejudicial to demand reversal." Actually, practically all of the letters from Better Business Bureau concerning the complaints were addressed to the personal attention of one of the defendants, and there were eventually acknowledgments to many of them, either by letter or by telephone. Customers testified also concerning many complaints which they had made to defendants personally as well as in writing. It is incredible to suggest that defendants were unaware that there were many complaints concerning the misrepresentations of the hearing aids and their manner of doing business.

Present counsel relies heavily for reversal on Phillips v. United States, 356 F.2d 297 (9th Cir.1965), and Reisman v. United States, 409 F.2d 789 (9th Cir. 1969). Both of these cases are readily distinguishable. In the first place, unlike the exhibits here complained of, the exhibits in those cases which were taken from the companies' files and admitted into evidence contained numerous complaints, the contents of which were extremely damaging. In the *Reisman* case, hundreds of them were admitted, many were read to the jury, all were sent to the jury room, and the prosecutor urged the jury to examine them and give them weight. In the *Phillips* case, only one letter was read to the jury but the other letters were summarized for the jury and the contents were highly prejudicial. Additionally, some of the defendants in *Phillips* lived in cities other than where the records were kept and had never seen any of the letters in the file. They were admitted into evidence by the trial court on the theory that the defendants had constructive notice of them, but the court of appeals held that it was error to admit them unless the defendants had actual knowledge of them. The court distinguished *Phillips* from the *Press* decision, *supra,* where it was held that where the defendants had knowledge of approximately eighty per cent of the complaints but no notice of some of the other complaints it was not prejudicial error that they were mentioned in the testimony, stating in *Phillips* the following (356 F.2d at 303–304):

"But no question appears to have been raised concerning the possibility that not all of the conspirators had seen the complaints. The appellants in that case argued only that the testimony concerning these complaints was hearsay and that some of the complaints concerning which testimony had been received had not been brought to the attention of any of the conspirators. We do not regard *Press* as authority contrary to our views as expressed above."

In other words, there is a difference between all of the conspirators' not having seen all of the complaints, as in the *Press* case, and some of the conspirators' not having seen any of the complaints, as in *Phillips*. The former situation is present here and we think *Press* controls. Also, in the present case, the complaints themselves which were in the Better Business Bureau file were not sent to the jury, but merely the Bureau's letters notifying them that a complaint had been received from a particular person, usually enclosing a copy thereof, and asking that they attend to the matter and let the Bureau know what action had been taken. The trial court was meticulously careful to see

that the highly critical complaints were removed from the file, and defense counsel assisted in doing this. We find no error in the admission of Exhibits 30–1, 30–2 and 30–3.

■ Defendants' second contention is that they are entitled to reversal because the court erred in admitting into evidence Exhibits 24–7, 24–8 and 24–9 and the testimony of John Widick relating thereto. These were letters which Mr. Widick received from the hearing aid manufacturer to which the Sheehans had sent his hearing aid for repair. When he purchased it for $185.00, they said it had a one-year guarantee. He said "it didn't work at all, hardly," and he sent it back to them within the warranty period for repair. The Sheehans, in turn, sent it to the factory and it came back to Mr. Widick C. O. D., but he refused to pay it. These letters from the manufacturer to Mr. Widick concerning the hearing aid were received in evidence; however, Mr. Widick's testimony to the effect that the company said the guarantee had run out before the Sheehans ever sold it to him was stricken and the jury was instructed to ignore the statement. The record reflects the following:

(John Widick—Direct)

"A. We wrote to them about it and the company wrote back that the hearing aid—the guarantee was out on the hearing aid before they ever sold it to me.

"Mr. Wright: Now, Your Honor, I'm going to object to the question on the grounds that it's hearsay as to these defendants—correspondence between Mr. Widick and the Minneapolis company. It's irrelevant and incompetent.

"The Court: Yes. That part of the witness' statement that they said that the guarantee was out will be stricken and will be ignored by the jury. It's hearsay as to these defendants."

The government contends that these exhibits go only to the relationship of the manufacturing company and the defendants and also that the impartial immediate response lends to these letters a circumstantial probability of reliability, but even if these letters are considered to have been improperly received, we think their admission is harmless since the court had already instructed the jury to disregard the statement by the company that the guarantee had run out and since the other evidence of guilt was so strong. See Lowe v. United States, 389 F.2d 108, 112 (8th Cir.1968); Thomas v. United States, 281 F.2d 132, 136 (8th Cir.1960); Homan v. United States, 279 F.2d 767, 773 (8th Cir.1960); Garner v. United States, 277 F.2d 242, 245 (8th Cir.1960). See also Glasser v. United States, 315 U.S. 60, 67, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

In Lowe v. United States, supra 389 F.2d at 112, this court said:

"* * * [E]ven if it be assumed that the trial court erred in receiving the objected to testimony * * * a substantial injury to the rights of the accused must appear before a judgment will be reversed for the erroneous admission of evidence. Lutwak v. United States, 344 U.S. 604, 73 S. Ct. 481, 97 L.Ed. 593 (1953); National Dairy Products Corporation v. United States, 384 F.2d 457 (8th Cir. 1967); Cotton v. United States, 361 F.2d 673 (8th Cir.1966); Myres v. United States, 174 F.2d 329 (8th Cir.), cert. denied, 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520 (1949) * * *."

■ There is no direct charge on appeal that the evidence was insufficient for conviction, although it is contended that the evidence shows that each defendant and each salesman operated separate from a common scheme to defraud, which constitutes a fatal variance from the indictment alleging a single scheme and artifice to defraud, and that the evidence against one defendant was not admissible against the others and they were prejudiced thereby. We do not agree. Although the companies maintained offices at different locations and were owned by only one or two of the defendants at the same time, all three worked for Electronic Hearing Aid Com-

pany in 1959 when William was the owner and Robert and Joseph were salesmen, and there was a continual change of names and businesses between them, all operating in the same manner and many times selling to the same customers. Joseph testified that William owned Transistor Hearing Aid Company in 1959, that he worked for him for a year as a salesman, and that at that time Robert and Floyd, another brother of William and Robert, worked there as salesmen. Then Joseph and Robert worked together at another location for three or four months under the name of Central Iowa Hearing Aid Center. Afterwards, Robert operated Electronic Hearing Aid Company from the old Central Iowa location and Joseph worked out of his home under the name of Central Iowa. Later, he and Robert both moved their businesses to another location. The offices seemed to be essentially family operations, other members of the family working for the defendants in secretarial and clerical capacities. After 1962, Joseph was the sole owner of Electronic Hearing Aid Company.

Many times two of the defendants, or one of the defendants and another salesman, called on customers together. Their sales talks and manner of operation were essentially the same. Within a few months, or even days, after making a sale, they would sometimes sell or attempt to sell the customer a different hearing aid, sometimes a used one which they represented as new. They usually took the previously sold hearing aid in on a trade but charged the customer full price or more. They failed to service the hearing aids as promised or guaranteed. One of the defendants would sell a customer a hearing aid and then he or another defendant, representing the same or another company, would call on the customer offering a "better" one. Joseph, the only one of the three who testified, denied that they had any access to each other's prospective customer list, however. Although William and Robert Sheehan did not testify, it was proven by customers who testified that

they had received cards, letters and hearing aids from them through the United States mails. Joseph identified an advertising card which he mailed out from Central Iowa Hearing Aid Center to Mr. Widick. It is clear that the mails were used in the advertising and sale of hearing aids and it is equally clear that their sales, particularly their repeat sales, were fraudulent.

During the period between March, 1963 and February, 1964, over $7,000.00 in checks were written by Mrs. Minnie Ver Meer, an 87-year-old lady, payable to Electronic, Stereophonic Sound, Transistor, Iowa Central, Robert Sheehan and Josephine Mary Cipale, Joseph's wife. Robert and Joseph were involved with these companies at this time. Joseph's wife carried a bank account in her maiden name of Cipale to which the checks made out to her in that name were deposited. Joseph admitted that they were married at that time and was unable to satisfactorily explain why her bank account was in her maiden name. These checks ranged from $150.-00 to $500.00, many of which were given within a few days of each other, and on January 1, 1963, Mrs. Ver Meer gave two $500.00 checks, one to Transistor and the other to Robert L. Sheehan. It seems reasonable that one good hearing aid could be expected to last throughout this period of ten or eleven months, and any scheme whereby a customer is sold innumerable hearing aids at a cost of over $7,000.00 during that period is ample evidence to sustain a finding that there was a scheme to defraud and that she was, in fact, defrauded out of most of her money. Defendants contend that there is no proof that all of the checks were for hearing aids, but if they were not the evidence is still sufficient to justify an inference that Mrs. Ver Meer was defrauded out of her money.

One of the cases cited by defendants is Friedman v. United States, 347 F.2d 697 (8th Cir.1965), but we think it supports the government's position rather than the defendants'. It was there contended that there was a fatal variance

between the indictment and the proof since the indictment charged a single general overall scheme involving management and personnel from studios in both Minneapolis and St. Paul, and it was contended that at best the evidence indicated two disconnected and different schemes. The court, however, reached the following conclusion (347 F.2d at 708):

"We think it well established that there was one overall scheme to defraud and that this overall scheme encompassed both the Minneapolis and St. Paul studios. It was not essential to a determination of guilt herein that Lowery should have been instrumental in each operation or in operation out of the St. Paul studios. While Lowery's activities could have been limited to the Minneapolis studio, the jury could well have found, as they undoubtedly did find, that he was aware of what was going on in the St. Paul studios also. In a somewhat similar situation, this court recently said in Koolish v. United States, 8 Cir., 1965, 340 F.2d 513, 525, certiorari denied, [381 U.S. 951] 85 S.Ct. 1805, [14 L. Ed.2d 724]:

" 'We are fully satisfied from an examination of the tremendous record here that substantial evidence supports the jury finding that there was an overall conspiracy to defraud and to obtain money and property from the Kenny Foundation and its donors, that each of the appellants cooperated with the others and each knowingly joined in the conspiracy, and that use of the mails to defraud was established in furtherance of the overall objective. It is immaterial whether or not there were minor conspiracies or schemes inside the overall conspiracy to obtain money from the Kenny Foundation and its contributors through false and fraudulent pretenses, representations and promises and that some of the defendants participated in some of these inner or smaller schemes but not in all of them.' "

This is descriptive of the situation here.

Also cited by defendants is Pritchard v. United States, 386 F.2d 760 (8th Cir. 1967), to the effect that proof that a particular defendant is a part of the scheme to defraud is essential before any testimony about other persons' actions and statements is received. Further, they call attention to the court's holding that proof of employment of the salesmen standing alone is an insufficient factor for admitting representations made by them to the victim and that there must be some evidence to support a finding of authorization or ratification by the defendants. They contend that under this holding the activities of the other salesmen should not have been admitted, but we disagree. The court held in *Pritchard* that there was adequate circumstantial evidence to support a finding of ratification under facts very similar to the facts here. In this regard the court said (386 F.2d at 767):

"The representations made by the salesmen were substantially similar to those made by the defendants in similar situations and followed the same pattern. The salesmen were frequently present when defendants made their sales pitches. * * * On other occasions if an inquiry had been made by a prospect, the salesman was sent by the defendant to see the prospect and attempt to make the sale * * *. In a number of instances, the victims, after talking with a salesman, conferred with one or more of the defendants prior to entering into a contract and in such conversations, the representations made by the salesman were confirmed.

"In any event, the negotiations with respect to many of the victims were handled directly by one or more of the defendants and the sentences imposed can be supported by convictions on counts in which there was no material participation of any nondefendant salesman. No prejudicial error was committed in the circumstances of this case in admitting the victims' tes-

timony as to the salesmen's representations."

The same is true in the instant case.

Another case cited by defendants is *Reistroffer v. United States*, 258 F.2d 379 (8th Cir. 1958), cert. denied, 358 U. S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959), but it also supports the action of the trial judge. *Reistroffer* was a unanimous opinion of this court. There objections were made throughout the trial to testimony of customers concerning the sales talk of the defendants charging that it was hearsay as to all or nearly all of the defendants on trial and, therefore, inadmissible as to them, and that if it should nonetheless be admitted, a limiting instruction should be immediately given to the effect that the jury should not consider it unless the scheme to defraud was proved as charged and that the proffered matter was proved to be in furtherance thereof. The court overruled the objection after being assured by the prosecutor that he had evidence to connect up the testimony to be elicited from the witness with the alleged scheme to defraud, and stated that complete instructions would be given later. We quoted the trial court's statement refusing to limit the testimony to a particular defendant as follows (258 F.2d at 387):

" '* * * The Court refuses to limit it to this specific defendant. * * * I might state my position: That under the common plan, scheme and design they may offer their proof in support of the charge. Whether it is sufficient that will be for the Court or jury to decide afterwards. Under the circumstances we have a different situation * * * 3–A may be received. You may read this to the jury.' "

Commenting on the trial court's action, this court said (258 F.2d at 387):

"We find no error in the course followed by the Court. Where the scheme to defraud included making sales by means of certain false representations conveyed through salesmen,

proof of the same misrepresentations being made at widely different places to different persons by numerous agents in the same period, tends to prove that the scheme existed and that the particular salesman was carrying it on. As in the case of a conspiracy in operation the acts and declarations of each participant are admissibile against all."

At page 388 we cited numerous cases to support our position that the testimony of the purchasers concerning their conversations with the salesmen were admissible upon the conditions prescribed by the court.

Instruction 18 correctly instructed the jury on this point, as follows:

"In the present case the Government has presented evidence as to statements made in the absence of the different defendants. Before you may consider such evidence as to any defendant, you must first find that the Government has by evidence apart from such statements established beyond a reasonable doubt (1) that the particular defendant and the person or persons making the statement or statements had knowingly and intentionally participated in devising the scheme described in the indictment, and (2) that the statement or statements were made pursuant to such scheme and in furtherance thereof.

"If the Government as to a particular defendant has so established both (1) and (2), you may consider such evidence in passing upon the guilt of such defendant and give it such weight as you feel it is justly entitled to.

"If the Government has not so established both (1) and (2), then you should reject such evidence and give it no consideration in passing upon the guilt of such defendant.

"The foregoing instruction relates only to evidence as to statements made in the absence of a particular defendant. It does not relate to evidence as to statements made by such defendant

or in his presence. Evidence as to the statements made by a particular defendant or in his presence may be considered by you in passing upon the guilt of such defendant even though the Government has not established (1) and (2) above set forth beyond a reasonable doubt."

In the *Reistroffer* case, *supra,* the defendants also asserted that although the indictment charged only one scheme to defraud there were under the proof three possible schemes and that there was consequently a fatal variance. They made no claim of variance at the conclusion of the government's evidence, but included a general charge of variance in the motions for acquittal at the end of the evidence. Answering this charge, Judge Woodrough, speaking for this court, said (258 F.2d at 393):

"It is true that in this case there was proof that defendants sold several different kinds of vending machines; that they used two different corporate names; that defendant Reistroffer went under different names; that a product called Bru Coffee they sold for use in the coffee machines was unfit; and that many different misrepresentations were made to effect sales. But we find no scheme proven that was segregated and unrelated to the general inclusive scheme charged in the indictment fraudulently carried on by repeating the same steps of procedure and actively participated in by all of these appellants.

"The reliance of the appellants in respect to their claim of variance is largely upon Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. That was a conspiracy case where the convictions were under a single general conspiracy charged. But the government admitted that the evidence proved some eight or more different ones of the same sort, connected only because they were executed through a key man common to all. Different persons seeking to obtain money by fraud from the government obtained his help at different times but independently of each other. The Supreme Court reversed the convictions on account of the variance and the resultant unfairness of the trial as to individuals.

"In this case the scheme as charged and proved was sufficiently unitary so that each of these appellants was connected with and bound by the proof that was offered and received against them or either of them. They all participated in the common scheme to sell vending machines and products to be sold therein. Neither of them is entitled to reversal on account of any variance between the charge and the proof or on account of alleged error in the instructions given by the court and not excepted to at the time."

The facts here are strikingly similar to the facts in the *Reistroffer* case, and we adhere to the views which we expressed there.

Defendants also complain of the admission of Plaintiff's Exhibits 1-1 through 1-9, which were photostatic copies of the registration of various trade names by the defendants. Applicants were Joseph Sheehan for Central Iowa Hearing Aid Center and Electronic Hearing Aid Company; Robert Sheehan for Stereophonic Sound Company and Transistor Hearing Aid Company; and William and Floyd Sheehan for Transistor Hearing Aid Company. These were exhibits to the testimony of Virgil Robert Pinegar, Second Deputy in the Polk County Recorder's Office, and bore his signature on the reverse side thereof attesting to the fact that they were authentic copies of the original records in the Recorder's Office. He also testified verbally as to their authenticity.[4]

4. With regard to Plaintiff's Exhibit 1-1, Mr. Pinegar testified as follows:
"Q. * * * Now on the reverse of that exhibit Mr. Pinegar, I believe you'll find your signature.

"A. Yes, sir.
"Q. And for what purpose is your signature on that document?
"A. When we make a certified copy, it must be signed by one of the deputies.

Rule 44(a) (1), Fed.R.Civ.P., 28 U.S.C.A., which was made applicable to criminal proceedings by Rule 27, Fed.R. Crim.P., 18 U.S.C.A., provides that a copy of an official record is admissible when "attested by the officer having the legal custody of the record, or by his deputy, and accompanied by a certificate that such officer has the custody." It further provides that "the certificate may be made by a judge of a court of record of the district or political subdivision in which the record is kept, authenticated by the seal of the court, or may be made by any public officer having a seal of office and having official duties in the district or political subdivision in which the record is kept, authenticated by the seal of his office." The court ruled that these were certified copies of original records and were admissible under appropriate statutes and rules of the court. Defendants now complain that these exhibits were not accompanied by proper certificates, but no objection was made on this ground at the time of their introduction. We find no merit to their belated objection. Certainly no prejudice could have resulted since the evidence which the exhibits contained was cumulative to other evidence in the record. Not only did Pinegar testify concerning the same facts, but other witnesses, including Joseph Sheehan, testified concerning the ownership and operation by the defendants of companies under the various trade names.

Defendants did make a timely objection, however, that no proper foundation was laid because the Deputy who testified was not employed at the Recorder's Office at the time all of the records were entered, but this is not re-quired. There would be few records for which a proper foundation could be laid if all those who had played a part in entering them of record had to testify and identify them.

Defendants also attack the admission of the photostatic copies on the ground that the originals would have been the best evidence and claim therefore that the Best Evidence Rule has been violated. As was said in United States v. Manton, 107 F.2d 834, 845 (2nd Cir.1939), cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1939), "if it appear, as it does here, that what is called the secondary evidence is clearly equal in probative value to what is called the primary proof, and that fraud or imposition, reasonably, is not to be feared, the reason upon which the best evidence rule rests ceases * * *." Furthermore, the admissibility of secondary evidence is within the broad discretion of the trial judge. United States v. Covello, 410 F.2d 536, 543 (2nd Cir.1969). It is not contended that the copies are fraudulent and since no prejudice resulted from their admission, there was no abuse of discretion on the part of the court in admitting them.

Defendants were each convicted on Count I, and since each received sentences and fines on his convictions on the other counts concurrent with the sentence and fine on Count I, all this court need decide is whether the conviction on Count I is good, and we hold that it is. "Firmly embedded in federal jurisprudence is the principle that a general sentence on several counts of an indictment will be sustained on appeal if the defendant was properly convicted under any count which is good and which is sufficient in itself to support the judgment and sentence." Pritchard v. Unit-

"Q. Is Exhibit 1–1 a certified copy of a record of the Recorder's office?
"A. Yes, sir.
"Q. And are the original records of which Exhibit 1–1 is a certified copy a part of the records that are made and kept in the regular and ordinary course of operating the business of the Polk County Recorder's Office?

"A. Yes, sir. The original copy is kept there on record forever."
A similar identification was made by Mr. Pinegar, of the other Exhibits 1–2 through 1–9, and in each instance he testified that they were authentic copies of the original records on file in the Recorder's Office.

**80**

ed States, *supra*, 386 F.2d at 763–764. To the same effect, see Barenblatt v. United States, 360 U.S. 109, 115, 79 S. Ct. 1081, 3 L.Ed.2d 1115 (1959); Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Sachs v. United States, 412 F.2d 357, 360–361 (8th Cir.1969); Isaacs v. United States, 301 F.2d 706, 733 (8th Cir.1962).[5]

Finally, the defendants contend that original counsel whom they retained was so inadequate that their constitutional rights were violated in that they were denied effective assistance of counsel and were convicted on evidence so meager that it amounted to a denial of due process. We cannot agree. They were represented by an attorney of their own choosing, who was obviously experienced. Although he did not object to the admission of as much evidence as their present attorneys would have liked, he did make numerous objections throughout the trial, and we cannot say that his failure to object at other times was due to incompetence. It could well have been the attorney's strategy to avoid objecting as much as possible in order to keep from giving the members of the jury the idea that he was trying to cover up something or keep them from getting all of the facts. It is not always in the best interest of a client for his attorney to continuously object to the admission of evidence, even though in some instances he may have valid grounds for objection.

Although there was some hearsay evidence admitted, it was not sufficient to prejudice the defendants. As hereinbefore stated, if there is sufficient evidence to sustain the conviction on any one count we must affirm since concurrent sentences and fines were given on all of the counts.

A defendant is not guaranteed "effective" counsel. Certainly, the fact that a defendant did not win his case is no reason in itself on which to base a charge that counsel was incompetent. The Sixth Amendment does not require for its satisfaction that the actions of counsel result in a favorable outcome. Meyer v. United States, 424 F.2d 1181 (8th Cir.1970); Kress v. United States, 411 F.2d 16, 22 (8th Cir. 1969); Evans v. United States, 346 F.2d 512, 514 (8th Cir.1965); Taylor v. United States, 282 F.2d 16, 20 (8th Cir. 1960).

The evidence in this case is strongly indicative of each defendant's guilt of a common and unitary scheme to defraud. We have carefully studied the appendix, transcript and record, and conclude that no evidence of any prejudicial nature was submitted to the jury; that there is no fatal variance between the evidence and the indictment; that at all stages of the trial and appeal defendants were represented by competent and adequate counsel of their own choice; and that in every long, hard-fought and complex case such as this strong argument can be made that in isolation some testimony should have been excluded or that trial tactics employed might not have been most beneficial. We are convinced, however, that a fair trial ensued here and that the learned and experienced trial judge was most meticulous in protecting defendants' every right. We are also convinced that our conclusion comports with the many decisions of this court, with those of other circuits and the Supreme Court.

For these reasons, the conviction judgments are affirmed.

5. See, however, Benton v. Maryland, 395 U.S. 784, 788–793, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), where the concurrent sentence doctrine was criticized.